FILED
2023 Nov-20  PM 08:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **FARIBA MOEINPOUR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 2:21-cv-01302-RDP** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ALABAMA,** *ET AL.* | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## RESPONSE TO DEFENDANT MARY JO CAGLE'S MOTION FOR SUMMARY JUDGMENT

---

**Teri Ryder Mastando (ASB-4507-E53T)**
**Eric J. Artrip (ASB-9673-I68E)**
**MASTANDO & ARTRIP, LLC**
**301 Holmes Avenue NE, Suite 100**
**Huntsville, Alabama 35801**
**Phone:       (256) 532-2222**
**Fax:          (256) 513-7489**
**teri@mastandoartrip.com**
**artrip@mastandoartrip.com**

TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. FACTS...............................................................................................................1

    A.    Plaintiff's Response to Defendant's Statement of Undisputed Facts ............1

    B.    Plaintiff's Additional Undisputed Facts...........................................................4

          a. Cagle Harassed Moeinpour based on Race During 2011 and 2012 to get her Fired and HR does Nothing but move Cagle Upstairs ......................4

          b. Cagle's Harassment of Moeinpour and attempts to get her fired continue after she is moved upstairs in 2012 and Moeinpour continues to Complain to Grubbs who does nothing ...............................................................6

          c. Moeinpour's Arrest and Termination...........................................................9

    C.    Plaintiff's Additional Disputed Facts ...........................................................11

          a. Cagle's Harassment of Moeinpour 2011/12................................................11

          b. Cagles' Race-based Harassment Continues After she is Moved ...............14

          c. Moeinpour's Arrest and Termination...........................................................19

III. LEGAL ARGUMENT ........................................................................................22

    A.    Cagle's Calling Moeinpour a "Sand Nigger" on an Ongoing Basis For 9 Years, Harassing Her About Her Name, Accent, and Ability to Speak English is Harassment Based on Her Race.....................................................23

    B.    Moeinpour Has Evidence That Cagle Interfered with Her Employment by Creating a Hostile Environment Based on Her Race That Ultimately Resulted in Her Termination in Violation Of § 1981......................................25

IV. CONCLUSION ...................................................................................................27

COMES NOW, Plaintiff, and files her Response to Defendant Mary Cagle's (hereinafter "Defendant" or "Cagle") Motion for Summary Judgment and in support thereof, states as follows:

## I.    INTRODUCTION

Cagle made it her personal mission, from Moeinpour's first day of work with her, to deride and make fun of Moeinpour's race, ethnic characteristics like her accent and name, and her national origin for a period of 9 years.  Because UAB would not credit any of Moeinpour's complaints, Cagle's harassment grew more volatile, to include stalking Moeinpour both at work and outside of work, threatening her with a gun, and calling her a "sand nigger" throughout the 9 years they worked together.  Cagle personally and intentionally interfered with Moeinpour's right to perform her employment contract with UAB free of race-based harassment under § 1981 and can be held personally liable for her own actions under that statute.

## II.    FACTS

### A.    PLAINTIFF'S RESPONSE TO DEFENDANT'S "STATEMENT OF UNDISPUTED FACTS"

1.    Disputed that Cagle was without any supervisory influence. Cagle had an "unorthodox" amount of control over Dr. Clinton Grubbs, Moeinpour's and her supervisor, and told him to "get rid of Moeinpour, an Iranian liar" on multiple occasions. Moeinpour believed, due to the amount of influence and control Cagle had over Grubbs, he was only Moeinpour's supervisor by "title." (Doc 87-3 at 70:18-20).

2.    Disputed that Grubbs gave Moeinpour pay raises or a promotion.  Moeinpour's pay raises were yearly UAB wide merit raises and the "promotion" was a UAB-wide reclassification of positions. (Doc 87-2 at 230, 229:1-232 13).

3.    Undisputed that Cagle, Hale, and Gray made a series of false complaints that were ultimately found to be "unsubstantiated" by UAB.  See Plaintiff's Additional Undisputed Facts 2,

8, 10, 12.

4.      Undisputed that Cagle, Hale, and Gray made a series of false complaints that were ultimately found to be "unsubstantiated" by UAB.  See Plaintiff's Additional Undisputed Facts 2, 8, 10, 12.

5.      Undisputed.

6.      Disputed as an incomplete summary of Plaintiff's many complaints of race and national origin-based harassment by Cagle. See Plaintiff's Additional Undisputed Facts 6, Disputed Facts 1-35.

7.      Disputed as an incomplete summary of Plaintiff's many complaints of race and national origin based harassment by Cagle. See Plaintiff's Undisputed Facts 6, Disputed Facts 1-35.

8.      Disputed as an incomplete summary of Plaintiff's many complaints of race and national-origin based harassment by Cagle. See Plaintiff's Additional Undisputed Facts 6, Disputed Facts 1-35.

9.      Undisputed.

10.      Disputed. According to Bonasera, Cagle was moved because of the continuing complaints and she and Moeinpour "could not get along." (Doc.87-9 at 144:5-145:11). Per Mayer, Cagle requested to be moved because she was "concerned." (87-13 12:13-14:5) Dr. Charles Prince also received a letter from David Wright, chief of the federal government Office of Research Integrity ("ORI") almost immediately before Cagle was moved, demanding that something be done about Cagle's continued harassment of Moeinpour by May 18, 2012. (Doc. 94-2)

11.      Undisputed.

12.      Disputed directly by Moeinpour's testimony that she made many complaints both to Grubbs and to HR regarding Cagle's continued harassment. See Plaintiff's Additional Undisputed

Facts 6, Disputed Facts 1-37. Disputed that Moeinpour's complaints were entirely unsubstantiated. See Plaintiff's Additional Undisputed Fact 10.

13.     Undisputed.

14.     Disputed as an inaccurate and incomplete summary of the numerous complaints Moeinpour made regarding Cagle's continued harassment of her based on her race and national origin between 2012 and 2020. See Disputed Facts 18-37.

15.     Disputed as an inaccurate and incomplete summary of Cagle's continued harassment and threats of physical harm to the Plaintiff between 2012 and her termination in February of 2020. See Plaintiff's Disputed Facts 18-37.

16.     Undisputed.

17.     Disputed.  Grubbs attacked Moeinpour on February 13, 2020, to keep her from reporting the ongoing hostile environment created by Cagle at work that resulted in Moeinpour's termination. Cagle was interviewed by Collins as part of her investigation that led to HR's recommendation to terminate Moeinpour. See Plaintiff's Disputed Facts 37-44; Additional Undisputed Facts 30.

18.     Undisputed but incomplete.  Cagle also received 4 months' severance. (Doc 87-29 at 153:1-5; 158:1-159:5; Doc.94-34)

19.     Undisputed.

20.     Undisputed that the box "race" is not checked but disputed that "race" is not referenced because the first sentence of the particulars states she is "of Persian descent." (Doc 87-41).

21.     Disputed.  Moeinpour's account includes harassment by Cagle based on both "race" and "national origin." See Plaintiff's Additional Disputed Facts 1-37.

**B.    PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS**

**a.    Cagle Harassed Moeinpour based on Race During 2011 and 2012 to get her Fired and HR does Nothing but move Cagle Upstairs**

1.    During the 2011/12 investigation, HR was provided by Cagle, Hale, and Gray with a series of pictures taken of Moeinpour that were taken of her and/or Grubbs outside of work by someone who was clearly following her.  Moeinpour explained that she had borrowed Grubbs' lawnmower to mow her own grass and was photographed without her knowledge making sure she could handle that lawnmower.  Hale admits giving the lawnmower picture to HR as "proof" Moeinpour and Grubbs were having an affair and "could have" taken many of the pictures submitted to HR to "catch" Grubbs in a lie. (Doc 87-4 at 624, 628:16-23; Doc 87-10 at 128:1-14, 132:3-135:2). [1]

2.    Nothing provided to HR during the 2011/12 investigation by Hale, Cagle, and Gray were "concrete" evidence sufficient to prove a romantic relationship between Moeinpour and Grubbs in violation of UAB policy. (Doc 87-9 at 113:6-11).[2]

3.    Between October 31, 2011 and November 2, 2011, Moeinpour sent Bonasera 3 emails complaining very specifically about stalking, harassment, calling her a "slut," showing a middle finger while saying "f-you," and other misconduct by Cagle. Moeinpour continued to raise that these behaviors continued in writing to HR and Grubbs in February of 2012, March of 2012.  (Doc 87-9 at 244:4-16; Doc. 94-6; Doc.94-7; Doc. 94-8; 94-9; Doc 87-45).

---

[1] Although Bonasera denies that UAB suggested the accusers follow Grubbs and Moeinpour to provide pictures, her contemporaneous notes suggested they did stating "suggested they provide pictures as proof."  After this, "ironically" pictures began to arrive. (Doc 87-9 at 76:8-16, 77:17-78:5; Doc. 94-12 at 27:1-28:3; 94-13).

[2] Neither Bonasera nor Mayer told Moeinpour during this investigation that someone had been following her and taking pictures of her without her consent, even for her own safety.   (Doc 87-9 114 9-115:17;87-13 99:9-23). An employee following another employee to take pictures without their consent could violate UAB's Violence Prevention Policy. (Doc 87-13 at 97:5-14). No inquiry was made into how these "anonymous" pictures fortuitously appeared just as Hale, Cagle, and Gray were incorrectly reporting a romantic relationship. *Id.* Even though one set of surreptitious pictures is addressed to Mayer, and signed "Jeanne Hale," Mayer testified she had no knowledge or memory of who gave HR the pictures. (Doc 87-13 at 163:10-164:16). Of course, now they acknowledge they did take the pictures.

4.      Moeinpour complained to Grubbs by email dated February 29, 2012, that Cagle continued to harass, discriminate against her, and retaliate against her.  Grubbs only response he recalls is for her to ignore it and do her job. (Doc 87-2 at 223:2-9; Doc.94-10).

5.      Bonasera and Mayer both denied repeatedly that during 2011/12 Moeinpour had ever raised the idea that she was being discriminated against and due to her national origin. (Doc 87-9 at 131:21-132:2, 160:1-162:13, 210:18-23; Doc 87-13 at 84:22-85:11).

6.      By email dated April 4, 2012, addressed to Bonasera, Moeinpour summarized her meeting with Mayer on April 4, 2012, in which she had complained that HR had failed to stop to Cagle's "retaliation" and "discrimination (since I am the only non-native American, and she has isolated me by making fun of my name and accent." Moeinpour had also complained to Mayer (and then Bonasera through this email) that Cagle had gathered every "American" she met against her and that Cagle had told another employee to get a bb gun, shoot her head, and "send [it] back to her country."  Moeinpour specifically states that she is being "singled out" as the "only non-native American" and therefore raised discrimination, harassment, and retaliation based on her race and national origin.  (Doc 87-3 at 480:5-22; Doc 87-16.).

7.      On April 10, 2012, Moeinpour sent an email summarizing much of the harassment she was subjected to by Cagle, including "every morning" Cagle calls Moeinpour a liar, says "shit in her face," calls her a "crazy woman", "spits on" Moeinpour's shoes, calls her "poop" or says "poop," "stalks" her, calls her a "troublemaker" and gives other people a "negative image" of her. (Doc. 87-3; Doc. 94-44). Moeinpour continued to send emails to HR regarding Cagle's continuing harassment in May of 2012. (Docs.94-41; 94-42; 94-43).

8.      Many of the "complaints" raised by Cagle, Hale and Gray during the 2011/12-time frame about Moeinpour, including walking up and down the hall, recording, changing the work

environment by spending time talking with her supervisor Grubbs, do not violate any UAB policy. Calling someone a "sand nigger" would violate UAB policy and should be investigated. (Doc 87-9 at 127:2-9; Doc 87-13 73:10 -77:7, 79:22-80:4).

9.      In 2012, Robinson in housekeeping confirmed during UAB's investigation that Cagle warned staff to "stay away" from Moeinpour because she was trouble. Robinson also substantiated that it looked to her like Cagle might be "carrying a gun."  (Doc.94-11; Doc.94-13, 6321). Robinson likewise told Moeinpour to be careful because it looked to her like Cagle was carrying a gun. (Doc 87-5 at 809:20-810:12).

10.     In June of 2012 HR wrapped up its investigation of both Moeinpour's and Cagle's complaints, finding the following complaints raised by Moeinpour were "substantiated:" 1) claims that Cagle had called her a "liar," 2) cleaning staff was told to avoid Moeinpour because she was a "troublemaker," and 3) it appeared Cagle might be carrying a gun.  Nonetheless, the only action taken was to move Cagle to another office upstairs. (94-13; Doc 87-18).

11.     No one, Cagle, Moeinpour, Hale, or Gray received any discipline as a result of the 2011/12 investigation. (Doc 87-9 at 137:1-7).

      **b.  Cagle's Harassment of Moeinpour and attempts to get her fired continue after she is moved upstairs in 2012 and Moeinpour continues to Complain to Grubbs who does nothing**

12.     Grubbs acknowledged that Moeinpour complained to him "over and over," "in 2016: and "until 2020", in 2016 and "all the time" at least once per week or 2 weeks, that Cagle was stalking her, following her, calling her a liar, and that Cagle didn't pronounce Moeinpour's name right. Grubbs did nothing but tell her to stay away from Cagle. (Doc 87-2 at 264:1-14, 322:22-323:3; 358:16-359:7).

13.     According to Cagle, although Grubbs would say something to Cagle about Moeinpour's

complaints, he also said "I know you aren't doing this" or "I know this is not true but I have to ask you anyway." Grubbs did tell her more than once that Moeinpour might be terminated. (Doc 87-7 at 145:9-18; 171:22-172:9).

14.    Per Grubbs, Moeinpour "probably" complained to Grubbs that Cagle said things about sending her back to her country and what kind of name she had but he did not want to act on it because it was a he said/she said situation. (Doc 87-2 at 256:22-257:7).

15.    Moeinpour's substantial increase in pay and change of title was University-wide and not related to Grubbs' requests made over a year before it happened. (Doc 87-2 at 230; 229:1-232 13).

16.    Emails produced by UAB substantiate that Moeinpour continued to complain to Grubbs in September of 2012 (after Cagle was moved) that Cagle continued to harass her and be hostile to her and make it difficult to complete her job.  Grubbs acknowledged that Moeinpour's work continued to be "excellent."  The only thing Grubbs did in response to this email was to tell her to "turn and walk away."  Grubbs' email response is consistent, telling Moeinpour "ignore it." (Doc 87-2 at 285:15-292:10; 94-14; 94-15).

17.    In June of 2014, after Gray had been gone from Grubbs' lab for 2 years, she sent Cagle information about Moeinpour's salary by email. (Doc 87-8 at 215:12-217:4).

18.    On July 5, 2017, months after Hale left her employment in January of 2017, Cagle sent Hale an email that she had sent to Grubbs, accusing Grubbs of lying about "Fabria," among other unhinged accusations, including him of "not loving her" or calling her as often as he should.  Cagle claims to have information "on" Grubbs to blackmail him. Cagle also accuses Moeinpour of being a liar. (Doc 87-2 at 324:15-327:16; Doc. 94-16; Doc 87-10 at 157:12-163:13).

19.    On July 5, 2017, Hale sent an email to Cagle that she had sent to Grubbs contact at the NCI, accusing Grubbs of hiring his "girlfriend" Moeinpour, overpaying her, and giving her

research credit on papers she did not earn. Grubbs denied all of these accusations. (Doc 87-2 at 330 1-334:5; Doc.94-21).

20.      On May 5, 2018, Cagle emailed Grubbs accusing him of being "too focused on your much needed weekend trip to relax and spend time with your girlfriend and her daughter," referring to Moeinpour and Nicki.  (Doc 87-7 at 241:12-243:2; Doc.94-17).

21.      Cagle stalked Nicki's (Moeinpour's daughter) Facebook profile, accessing it 4-5 times. Cagle sent Grubbs a close up of Nicki holding a dog as part of a group of young people that Cagle had pulled off of her Facebook page.  On May 9, 2018, Cagle sent a message through work email to Grubbs with Nicki Lawsen's Facebook profile picture and Nicki's posted picture of a group of young people with only the subject line "who is the liar." (Doc 87-7 at 234:12; 294:21-296:9; Doc. 94-18).

22.      On October 31, 2018, Cagle sent a long, vituperative email to Grubbs accusing Moeinpour, of "violently screaming at a neighbors' grandkids," accusing Nicki of posting "a lot" about Grubbs on Facebook and her "dog," Nicki of using "NIKKILAW1" and posting "Mom has us a good man" and calling out Grubbs for attending Nicki's graduation. Cagle complains about Nicki being "downstairs babysitting." Cagle acknowledged that information regarding "screaming" at a neighbor's child came from Hale, whose friend was a neighbor of Moeinpour. Cagle has no recollection of what "NIKKILAW" was and has no recollection of Nicki posting anything about Grubbs. Cagle was angry because Nicki was with Moeinpour at work (even though Nicki was in her 20s at the time and Cagle had been moved upstairs for years) and did not report this to HR. (Doc 87-7 at 243:15- 251:1; Doc. 94-20).

23.      Grubbs and Cagle exchanged emails on July 29, 2019 (forwarded to Hale) in which it is clear that Cagle has been to his farm, stored a boat trailer on it, refuses to ever come back because

"Ms. Moeinpour Lawsen Grubbs will be as loving and understanding as I have been." (Doc. 94-21).

24.     In 2019, Cagle (upstairs), Hale (left in 2017) and Gray (left in 2012) made an anonymous complaint to various officials at UAB, including Chen. with a threat to report to NCI to affect Grubbs' funding.  The complaint accused Moeinpour of unethical behavior and "fraudulent abuse of funding" by working only 8-10 hours per week and that Moeinpour has "been very forthcoming about her long-term consensual relationship" with Grubbs. Moeinpour was never told about this complaint. (Doc 87-7 at 267:13- 277:14; Doc.94-22; Doc 87-10 170:1-185:17; Doc 87-4 at  638:3-639:15; 676:1-678:21).

25.     UAB spent months investigating this complaint, pulling all of Moeinpour's emails, looking at her computer time, and pulling her records for exiting and entering the garage.  The investigation was still ongoing at the time Moeinpour was terminated in February of 2020.  UAB ultimately found no evidence of wrongdoing by Moeinpour.  (Doc 87-29 at 117:19-118:8).

### c.  Moeinpour's Arrest and Termination

26.     Grubbs "made up" a story that Cagle was in the mafia and dangerous in response to Moeinpour's complaints that Cagle was "dangerous" to get her to leave him alone and "calm her down." Grubbs specifically told Moeinpour that Cagle had told him if he had her fired, she would send four guys from the mafia to kill him to get Moeinpour to stop her from "hollering at him" to fire Cagle. (Doc 87-2 at 395:21-397:12, 409:3-20, 410:20-411:19).

27.     The day before she was arrested, February 12, 2020, Moeinpour had printed out emails that she sent to Bonasera, Mayer, and Meeks regarding the harassment by Cagle and placed them in her desk to take to Chen and report the harassment.  She never did that because she was arrested. (Doc. 87-3 at 34:1-35:17). UAB did not produce those emails even though they were requested.

*Id.*

28. On the evening of February 12, 2020, Grubbs recorded some or all of the conversation that took place with him, Moeinpour, and Lawsen and later produced an edited version to UAB during its investigation. Although Grubbs testified that Moeinpour threatened that evening to report to Chen that he had falsified data, the recording reveals that, instead, Moeinpour was telling Grubbs she intended to report the hostile environment created by Cagle. Although Grubbs testified that Moeinpour told him she would "get him fired," the recording reveals that Moeinpour told him the opposite, she was not going to ask that he be fired. (Doc 87-2 at 373:22-374:20; Doc.94-3).

29. The police report created on February 13, 2020, states that Moeinpour reported to the police that she slapped Grubbs in self-defense because he "groped" her in the groin area. The police report reflects that Grubbs told them he and Moeinpour were in a relationship. Grubbs acknowledged to the police that the "argument" was about Moeinpour reporting something to Chen "over his head," although he told them it had already occurred. (Doc 87-23).

30. Williams delegated the investigation of the attack to Collins. Collins interviewed Grubbs and Cagle even though Cagle was not present at UAB on the day of the incident. Collins' investigation notes reflect that she interviewed Cagle on February 17, 2020, and that Cagle accused Moeinpour of "violent" and "bizarre" behavior and of suing UAB. Cagle called Grubbs a "good man" and acknowledged she was at the Summit "2 days before Christmas." (Doc 87-29 at 71:15-23; Doc. 94-27; Doc 87-30 at 23:10-15).

31. During the investigation, Grubbs also provided HR with a series of recordings. (Doc 87-2 at 389:20-22; 94-3).

32. Grubbs told Collins that Moeinpour had "mental issues," was "bipolar," that he went to her house, and that she was "unstable." (Doc 87-30 at 5:1-15). Grubbs told Collins that he helped

Moeinpour financially because he "liked helping people" and did not claim she coerced him. (Doc 87-30 at 27:16-28:8).

33.     Grubbs provided 6 edited, short recordings during the investigation that reveal only portions of Moeinpour's side of the discussion that took place when Lawsen and Grubbs came to her home uninvited on the evening of February 12, 2020.  The recordings that were in UAB's possession reveal that Moeinpour told Grubbs that she did intend to take her documents and report the hostile environment created by Cagle to Chen the next day, and that she was "not going to say "I want Grubbs fired."  The recordings also reveal that Moeinpour was told that Grubbs "had a prostitution operation" on his farm. (Doc 87-2 at 389:20-22; Doc. 94-3).

34.     On February 20, 2020, Cagle filed another police report regarding Moeinpour with UAB police, yet again accusing Moeinpour of creating a hostile work environment. (Doc 87-29, Doc.94-33) .

35.     Grubbs was allowed to retire, and Cagle received 4 months' severance. (Doc 87-29 at 153:1-5, 158:1-159:5; Doc. 94-19)

### C.     PLAINTIFF'S ADDITIONAL DISPUTED FACTS

#### a.   Cagle's Harassment of Moeinpour 2011/12

1.     On her first day working for Grubbs, when Grubbs introduced her to Cagle, in his presence, Cagle said "what?" Grubbs responded "Moeinpour," and Cagle responded "what kind of ass name is that?  We're going to have a lot of problems pronouncing this damn name." When Moeinpour complained to Grubbs about this, he responded by doing nothing but stating that it was "just her personality." (Doc 87-3 at 149 148:22-150:1). Grubbs also told Cagle Moeinpour was from Iran. (Doc 87-3 at 151:15-152:5).

2.     During her first conversation alone with Cagle, Cagle told Moeinpour she knew what

happened in Chaudry's lab, but she would be able to sue for that "but it won't go anywhere because you are from that damn country." (Doc 87-3 at 150:13-152:15).

3.      During the first 6 months, Cagle told Moeinpour she was not part of the family at work and spat on the floor. Cagle gathered people in her office including maintenance employees, Hale and Gray, and say loudly, when Moeinpour had to pass by to use the restroom, here comes a "liar" and/or "damn Iranian." The other employees would laugh. Moeinpour reported this behavior to Grubbs, her supervisor, and he told her not go to HR because they were "looking for excuses to get rid of her." (Doc 87-3 at 162:10-163:3, 185:1-15, 182:23-184:13).

4.      Grubbs told Moeinpour that Cagle was dangerous, that she had been convicted of prostitution and knew dangerous people. (Doc 87-43 at 385:14-20).

5.      Moeinpour denies telling Gray, Hale, or Cagle anything about what happened to her in Chaudry's lab. The only person she told was Grubbs. (Doc 87-3 at 196;1-199:12).

6.      According to Cagle, the first time she complained to Bonasera that Moeinpour had falsely claimed she spit at her, Bonasera told her there were "already 3 complaints against her (Cagle)" by Moeinpour but she did not address any of those with Cagle, didn't tell her what they were, and told Cagle she "shouldn't worry about it." Bonasera also told Cagle that Moeinpour was a "troublemaker" and that she had a file cabinet "just on Fariba." Bonasera also told Cagle that she was writing down Moeinpour's complaints but "there was nothing we are going to do about that." Mayer told Cagle "Essentially the same thing" and never encouraged Cagle to modify her behavior in any way as a result of Moeinpour's complaints. (Doc 87-7 at 76:6-77:23, 140:22-141:23).

7.      Early in her work with Grubbs he asked Moeinpour to check data reported by her coworker Sukar. When she requested to know what antibody Sukar was using, Cagle refused to provide it calling Moeinpour a liar and stupid. Moeinpour had no choice but to call the vendor herself for

this information and discovered Sukar was not using the correct antibody and reported this to Grubbs. When Grubb told Cagle, Cagle became angry and told Grubbs, in front of Moeinpour "she doesn't belong here, you need to get rid of her, she ruined Chaudry's lab, she doesn't fit here." (Doc 87-3 at 165:20-169:16; 170:12-19).

8.      During the 2011/12 time period, during a meeting with Bonasera, Mayer, and Chris Meeks Moeinpour was told that she was accused of having an affair with Grubbs by Cagle, Hale, and Gray. Grubbs told her that they (including UAB) were just trying to get rid of her. (Doc 87-3 57:7-58-5, 64:16-23). Moeinpour also reported by email to Meeks that Cagle tripped her and that she called her a "damn Iranian" as well as other things that happened to her. (Doc 87-3 at 93:1-94:16).

9.      Moeinpour reported to Dr. Kirby Bland by email in the 2011-12-time frame that Cagle was behaving criminally to her and calling her names like a "damn Iranian." (Doc 87-39 at 91:18-92:9).

10.     Moeinpour recorded Cagle with a pen audio recorder calling her "sand nigger, liar, ew, shit to your face, laughing and an audio recording of her walking while Cagle was taking a picture of her. She gave the recordings to Mayer and Bonasera. (Doc 87-4 at 318:1-16, 318:14-21).

11.     Moeinpour provided Mayer with a recording she had made of Cagle showing her her middle finger and stating "bitch, go back to where you came from." Mayer acknowledged seeing it and said she would "get back to" Moeinpour and asked to keep the recording, so Moeinpour gave it to her the day it happened. Mayer never called her back, and when she picked up the recording and took it home it had been altered and was empty. (Doc 87-5 at 792:2-796:23).

12.     Moeinpour contacted Mayer to find out what happened to her recording and met with her. During the meeting, Meyer now claimed that she was unable to hear anything on the recording and to not know what Moeinpour was talking about, even though they had previously watched and listened to it together. (Doc 87-5 at 797:19-799:14).

13.     Moeinpour provided Bonasera with recordings and emailed her that her "intention is to harassment, retaliation, stalking, and discrimination to be stopped." (87-4 at 495:1-10, 94-44).

14.     Cagle came out of her office and spit on or near Moeinpour on a regular basis. Daily in 2011/12 and occasionally up through Moeinpour's termination after Cagle was moved upstairs. Moeinpour reported this to Grubbs, Bonasera, and Mayer. (Doc 87-3 at 212:17-215:13).

15.     On March 15, 2012, Moeinpour reported to Bonasera by email that Cagle stuck her head out of her office and said "Scott, bring your BB gun, we can shoot her head and send it back to her country." (Doc. 87-4 at 435:12-436:12).

16.     In Moeinpour's presence, Grubbs told Bonasera and Mayer that Cagle was volatile, calling Moeinpour a liar. (Doc. 87-4 at 447:1-12).

17.     Moeinpour found a note in her office that stated, "nonbeliever needs to be burned in hell" and something about their tongue, quoting a bible verse. Moeinpour took the note to Grubbs, and she left the note in HR for Mayer.  She and Grubbs later met with Mayer and Bonasera who had the note. In that meeting, Grubbs told Bonasera that Cagle and Hale had admitted to him they wrote the note. In this meeting Grubbs also told Mayer and Bonasera that he heard what Cagle said about Moeinpour's name when she was introduced, that she called her a "damn Iranian," and that she made fun of her name. (Doc. 87-4 at 449:9-453:17, 513:9-515:16).

**b.  Cagle's Race-based Harassment Continues After she is Moved.**

18.     After Cagle's office was moved, Cagle continued to stalk Moeinpour by waiting for her by the elevator when Moeinpour had to go to the pathology lab for a portion of her work.  Moeinpour would return to report it to Grubbs, and Cagle would follow her.  At times, she would be with her friends and say things loudly directed at Moeinpour, including "I hear she's a liar," and still spat on Moeinpour, called her a troublemaker, asked her "why the hell are you not leaving."  This

harassment continued every time she saw Cagle by the elevator through February 10, 2020. (Doc 87-3 at 567:21-568:22; Doc 87-4 558:1-13, 563:15-566:17).

19.    On July 17, 2012, Moeinpour summarizes a prior report to Grubbs by email that Cagle stared at her, intimidated her, and "used offensive language" toward her and that Grubbs had told her to "ignore her, the money will go out on October 31, 2012, and they will have to leave."  (Doc 87-4; Doc.94-46).

20.    When Moeinpour called for Grubbs and Cagle answered, Cagle said to her "shut up bitch, your lover is not here.  You go back to your damn country." (Doc 87-3 at 218:2-23).

21.    After 2012, Moeinpour emailed Mayer many times about the incidents of harassment by Cagle because UAB's Handbook required her to do that. (87-3 98:1-99:21) Nicki corroborated that she personally observed emails on her mother's computer between 2012 and 2017 "about Mary Jo Cagle ridiculing [her] mother for "her accent, calling her a damn Iranian." (Doc 87-21 at 66:7-67:15).

22.    Nicki recalled, in the early part of her undergraduate years at UAB (2012-17), seeing Cagle staring at her and her mother as they walked together toward Volker Hall.  Cagle was walking into the parking deck but pivoted to walk behind them into the building. (Doc 87-21 at 78:13-79:20). In 2015 or 2016, Cagle tried to run over Nicki and Moeinpour after they stepped off a curb to cross the parking lot at the Summit mall.[3] (87-21 80:81:7) In spring of 2018, Cagle saw Moeinpour and Nicki in Belk and came over to walk right behind them as they walked faster to get away. Cagle got as close to a foot behind them. When someone came over to ask if they were ok, Cagle left. (Doc 87-21 at 14-84:21).

23.    During 2017-19 Cagle and Hale visited a friend that lived across the street from Moeinpour

---

[3] It was not an intersection and there were no traffic lights

and sat out in the driveway and yelled at Moeinpour and her daughter "she can't speak English." Moeinpour did not respond and did report this to Mayer and Grubbs. (Doc 87-4 at 698:4-701:19).

24.     Cagle called Moeinpour a "sand nigger" on a regular basis up through her termination. (Doc. 94-4, ¶ 13).

25.     On September 10, 2019, Cagle showed Moeinpour the brown handle of a gun in the UAB parking lot and said to her "this is what we Americans do with Sand Niggers."  Moeinpour was walking down the stairs in the parking garage at UAB and Cagle was waiting for her at the bottom. Moeinpour was shaking, afraid Cagle was going to shoot her. (Doc 87-4 at 743:2-744:21).

26.     Moeinpour immediately called Grubbs from the UAB parking lot, and he came to talk to her. Moeinpour told him what had happened and that she wanted to call the police.  Grubbs told her not to because it would be her word against Cagle's and her son is a killer and she hides all of the evidence, and who knew where the gun was hidden now.  Grubbs told her UAB "hated" her and he was the reason she had a job. (Doc 87-3 at 43:3-44:6). Grubbs also told Moeinpour if she called the police, he would get involved and would not protect her from UAB's retaliation and that "I will make sure you get fired." (Doc. 87-3 at 78:1-70:7; Doc 87-4 at 745:6-749:13).

27.     Even though Grubbs had told her not to do anything, Moeinpour sent Mayer an email that same day stating, as Moeinpour recalls, "Dear Respected Ms. Mayer, I would like to have a meeting with you. I am afraid. Mary Jo Cagle, just an hour ago, she showed the handle of a gun in the UAB stairway parking deck to me and calling me a sand nigger. May I make appointment with you?" Moeinpour waited for a response and, when she did not receive one, she called Mayer and left a message with a person that it was an "emergency." Mayer did not respond at all until she sent an email 2 days later that said only "call me."  Moeinpour called but did not reach her immediately and was told to call back. (Doc.87-3 at 36:15-38:22).

16

28.    When Moeinpour finally reached Mayer, Mayer asked "what's up again Fariba." Moeinpour reported to Mayer that Cagle showed her a gun and called [to] her "this is what we do to sand nigger." Mayer responded "Oh, Fariba, you need to see a psychologist." Moeinpour asked "why" and was told by Mayer "we can't hire a bodyguard for you. I'm serious, you need to see a psychologist." Moeinpour told Mayer she was "afraid for her life" and requested to change parking decks. (Doc.87-3 at 38:23-40:23).

29.    After Moeinpour told her daughter about the gun, Nicki told her to keep the phone line open when she was walking to and from work.  A few times after this, over the open phone line, Nicki could hear Cagle calling her mother a sand nigger. (Doc 87-21 at 106:2-107:15).

30.    Moeinpour heard Cagle yell at Grubbs, referring to Moeinpour, that he needed to "get rid of this damn Iranian.  She doesn't fit in here." Cagle called Moeinpour a "damn Iranian" 20-30 times during the 2011/2012-time frame and continued calling her that right up until her termination. (Doc 87-3 at 68:8-69:12).

31.    Cagle continued to make false complaints about Moeinpour, accusing her of shining a light in her face in 2016. (Doc 87-4 at 14-665:22). In 2018 Cagle made another false complaint, accusing Moeinpour of "screaming" at her neighbor's grandkids, buying a dog for Moeinpour's daughter, leaving work to take her daughter to law school and go shopping, telling people she was engaged to a UAB doctor or Grubbs, Moeinpour's daughter of posting a picture of Grubbs on social media. Moeinpour and her daughter deny these allegations are true and they were never even addressed with Moeinpour at all. (Doc 87-4 at 668:22-675:3).

32.    Cagle had an "unorthodox" amount of control over Grubbs, told him to "get rid of her, an Iranian liar." Moeinpour believed, due to the amount of influence and control Cagle had over Grubbs, he was only Moeinpour's supervisor by "title."  (Doc. 87-3 at 70:18-20).

33.     On May 5, 2019, Cagle saw Moeinpour and her daughter Nicki Lawsen in Belk at the Summit Mall and said, "oh this shit."  Per Nicki, Cagle said "those shits." Cagle then followed Moeinpour and her daughter onto the escalator, staying only 1 or 2 steps away from them. When they arrived at the lingerie department, neither of them could see Cagle.   Nicki left to use the bathroom and, as she went down the isolated hall, heard quick footsteps behind her.  She looked over her shoulder and saw Cagle behind her. Nicki entered a stall in the empty bathroom and heard Cagle come in and saw her shoes and feet as she stood perhaps an inch outside the stall.  Cagle stood there until someone came into the restroom.  Nicki then walked out into the clothing she observed Cagle actually get into a round clothing rack and watch her walk by through the clothes. When Nicki reported she was being followed to a Belk employee, Cagle left. After Nicki returned and told her mother, they left the lingerie and went down the escalator.  Cagle followed them down the escalator, again 1-2 steps behind them, cussing at them then left Belk. (Doc 87-4 at 716:1-717:10; 727:3-19; Doc 87-21 86:9-95:14.)

34.     Immediately after this happened, Moeinpour called Grubbs and told him Nicki wanted to call the police.  Grubbs yelled at Moeinpour that if she called the police on Cagle he would get involved and that she would not have a job.  Nicki heard Grubbs yell at Moeinpour "if you call the police or anyone you will lose your job." (Doc 87-21 at 100:9-18, 101:20). Grubbs then got on the phone with Nicki on speaker phone and Grubbs screamed at Nicki "I will make sure your mother loses her job" and you are going to be in debt with student loans and would not have a life or a career." (Doc 87-4 721:1-722:5, 728:1-730:15; Doc 87-21 at 102:1-105:1). Moeinpour called Grubbs again when she got home, and Grubbs told her that Cagle "hated" her and was "crazy" and "bipolar" because her son's murder trial would soon start. (Doc 87-4 at 733:6-734:7).

35.     On December 23, 2019, Moeinpour and Nicki were shopping in a store at Summit Mall

when Cagle entered and made her way toward them in the store. As Moeinpour and Nicki left the

store, Cagle followed behind them, coming right up on them, while calling them sand niggers

"several" times. Nicki and Moeinpour went directly to a groundskeeper and complained they are

being harassed and stalked. The groundskeeper called security and fully corroborated this event,

including the use of the term "sand niggers" by Cagle. (Doc 87-21 at 108-111:23; Doc 87-5 at

824:7-825:16; Doc. 94-39 at 14:9-11; 12:18-13:10).[4]

36.    When Moeinpour and Nicki returned to the car, Moeinpour called Grubbs in Nicki's

presence and reported that Cagle was again following them and calling them "sand niggers."

Grubbs tells Moeinpour to "ignore her" and that "whatever she is doing, you have to deal with it.

You are not going to open your mouth about her, you're not going to have a job anymore, I will

make sure of that." (Doc 87-21 at112:15-113:3).

### c.  Moeinpour's Arrest and Termination

37.    On February 10, 2020, the bathroom near Moeinpour's lab was out of order, so she went

to the bathroom near the elevators, and Cagle was there whistling. She started following

Moeinpour to the bathroom. Moeinpour kept changing direction, and Cagle kept following her, so

she went to Grubbs' office. Grubbs agreed to distract her so Moeinpour could use the restroom.

When Grubbs returned Moeinpour cried in his office about Cagle's constant harassment. Grubbs

then told Moeinpour that he had told Cagle to stop, or he would fire her and that Cagle had

threatened Grubbs to send "another visitor" if he did. Grubbs then told her that he had been

"visited" by four men the last time he had told Cagle to stop harassing Moeinpour and was told

"this is your second warning, there won't be a third." Grubbs also told Moeinpour that Cagle was

---

[4] In her deposition, Cagle testified under oath that she was not even at the Summit on December 23, 2019. (Doc. 8707, 311:14-312:7). However, Collins' handwritten notes from her interview of Cagle contains a note stating, "2 days before at Christmas at the Summit." (Doc. 94-5, p. 14). Taking the facts in the light most favorable to the Plaintiff, a reasonable juror could conclude that Cagle admitted to Collins she did in fact interact with Plaintiff and her daughter.

in the mafia with someone named "Bruno." (Doc 87-4 at 753:2-763:19). Grubbs told Moeinpour Cagle was "very dangerous" and would "send a hit man." (Doc 87-4 at 768:12-21). Moeinpour then emailed to Mayer and told her what Grubbs had said – that Cagle had sent men to kill him because he had told her she would get fired if she continued to harass Moeinpour. (Doc 87-5 at 838:20-840:21).

38.    Grubbs repeated all of this about Cagle, including that his life was in danger and that she had sent hit men to scare him the next day on February 11, 2020, and Moeinpour recorded all he said. (Doc 87-5 at 845:6-20, 87-22).

39.    During the evening of February 12, 2020, Grubbs went to Lawsen and asked him to help him (Grubbs) because Moeinpour was going "to report his secretary to his boss" and if that happened, they would both lose their jobs. Lawsen agreed to Grubbs' plan of deceiving Moeinpour into talking to him by going with him to her house to retrieve belongings Lawsen had left behind. Grubbs immediately began telling Moeinpour not to escalate the problems with Cagle. Moeinpour responded that although Grubbs might not care about her safety, Cagle had threatened her with a gun, and she has told Grubbs she is in the mafia. Grubbs then said "dammit I told you you cannot report her. She's dangerous." Moeinpour repeatedly insisted she would be reporting Cagle to Grubbs' boss, Dr. Herbert Chen. Grubbs then threatened to go to the farm and "shoot himself." Lawsen came back into the room because there was yelling. Moeinpour did not want Grubbs to leave because he had threatened to shoot himself. Moeinpour spent the rest of the evening in her daughter's room. (Doc 87-5 at 854:10-861:10). Nicki corroborates this entirely because Grubbs was "screaming" at her mother that she could not report Cagle and threatened to shoot himself. (Doc 87-21 at 133:1-136:9). Lawsen also heard Grubbs "get very mad" and yelled at Moeinpour that she could not report his secretary and that he threatened to kill himself. (Doc.94-38, at 33:9-

37:18).[5]

40.     On the morning of February 13, 2020, Moeinpour called Grubbs on her way to work, and he again told her not to come to work and that she could not "escalate" things. (87-5 864:16-865:15) Grubbs then called her office and again said he told her not to come, and asked why she was there. Moeinpour told him she was there "to do her work" and meet with Chen. (Doc 87-5 at 867:1-20).

41.     When Grubbs arrived in Moeinpour's office she had not yet spoken to Chen. She had her printed emails showing all Cagle had done to her and the evidence that Grubbs had told her how dangerous Cagle was.  She still wanted to convince Grubbs to come with her as her supervisor to tell Chen about all Cagle had done. (Doc 87-5 at 869:14-22).

42.     On February 13, 2020, Grubbs attacked Moeinpour to prevent her from reporting Cagle to Chen.  When Grubbs arrived in her office, Moeinpour told him she was going to speak to Chen. Grubbs told Moeinpour she "could not go, you can't escalate this" and she responded nothing could change her mind.  Grubbs then stood up and told Moeinpour he was going to go the farm and "shoot himself." Moeinpour objected.  Grubbs then sat back down and picked up the phone and called UAB police and said, "we have a disturbance here."  Moeinpour then said she would go to Chen herself and stood up. She said, "I have my evidence." Grubbs then said, it is going to be your word against mine.  Then Moeinpour revealed it would not be, she had his words.  Grubbs then grabbed her chin, said "shut your mouth" about Mary Jo and pushed her down on the ground until she was laying on the floor.   (Doc 87-5 at 875:1-887:5). Grubbs then got on top of Moeinpour and grabbed her chin and said are you still going to report Mary Jo? Grubbs then grabbed her crotch and again said are you going to report Mary Jo? Moeinpour was crying and telling Grubbs,

---

[5] Grubbs is the only witness who disputes the events of that evening by his testimony.

"please, Dr. Grubbs, I am in pain."  Moeinpour tried to push him off, but she couldn't. Grubbs groped her again, and Moeinpour said "get away."  To get him to stop, Moeinpour slapped Grubbs. Grubbs said "you slapped me" then he left.  (Doc 87-5 at 907:5-917:8).

43.     In 2020, after Moeinpour was terminated, Cagle and her friend sat outside in the driveway drinking beer. When Moeinpour stopped to get her mail, Cagle yelled "that bitch needs to get killed." (Doc 87-4 at 19-708:12).

44.     On August 13, 2020, after Moeinpour's termination, Cagle followed Moeinpour when she was driving her car for 30-40 minutes. (Doc 87-4 at 19-708:12).

## III.    LEGAL ARGUMENT

Cagle harassed the Plaintiff due to her race, Persian/Arab, on a daily basis for over a period of approximately 9 years, in addition to making numerous false complaints regarding Moeinpour to UAB with the specific purpose of getting her fired.  Cagle ultimately succeeded because Grubbs attacked Moeinpour to prevent her from reporting Cagle's harassment, and Cagle gave a statement continuing to spew nastiness about Moeinpour during the investigation that resulted in Moeinpour's termination.  Cagle called Moeinpour a "sand nigger" over and over for the entire 9 years they worked in the lab, even while threatening her with a gun.  Cagle made numerous false complaints about Moeinpour, including stalking her to get pictures and making the unsubstantiated complaint that Moeinpour and her supervisor Grubbs were in a romantic relationship. Cagle even made a false anonymous complaint that Moeinpour was not coming to work and engaging in fraudulent billing even though Cagle had been moved upstairs away from her *seven years* before she made the complaint.

The Plaintiff has named Cagle as a Defendant for violating 42 U.S.C. § 1981, which prohibits all "persons" from discriminating against "non-white" persons in the making and enforcing of

contracts, which includes "making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Congress amended section 1981 in Section 101 of the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071, to clarify that the right to "make and enforce" contracts includes the right to "the making, *performance*, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" to ensure that creation of a hostile working environment was included in its prohibition. 42 U.S.C. § 1981(b); *see Rivers v. Roadway Exp., Inc*., 511 U.S. 298, 304, 114 S. Ct. 1510, 1515, 128 L. Ed. 2d 274 (1994) (acknowledging that Congress "legislatively overruled" the Court's prior decision that 1981 did not include creation of a hostile work environment).

Cagle's barrage of race-based harassment and baseless complaints about Moeinpour directly interfered with Moeinpour's ability to perform her employment contract and ultimately resulted in her termination, and she can be held personally responsible for her conduct under 1981 whether or not she was a "supervisor" at UAB.

### A.     CAGLE'S CALLING MOEINPOUR A "SAND NIGGER" ON AN ONGOING BASIS FOR 9 YEARS, HARASSING HER ABOUT HER NAME, ACCENT, AND ABILITY TO SPEAK ENGLISH IS HARASSMENT BASED ON HER RACE

Plaintiff is protected in the workplace by § 1981 from intentional discrimination solely because of her ancestry or ethnic characteristics. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613, 107 S. Ct. 2022, 2028 (1987). If Moeinpour "has evidence that [s]he was subjected to intentional discrimination based on the fact that [s]he was born an Arab, rather than *solely* on the place or nation of h[er] origin, or h[er] religion, [s]he will have made out a case under § 1981. *Id.*at 613. Because Cagle harassed Moeinpour based on her ethnicity (Persian/Middle Eastern/Arab) and ethnic characteristics (such as her accent, "difficulty speaking English"), and not "solely" because

she was born in Iran or might be Muslim, she has supported her claim for race discrimination under § 1981.

Courts have recognized that discrimination based on national origin often overlaps with other forms of racial discrimination. *See Id*. at 614 (Brennan, J., concurring) ("[I]n the Title VII context, the terms [race and national origin] overlap as a legal matter[,]" and the "line between discrimination based on 'ancestry or ethnic characteristics' and discrimination based on 'place or nation of origin,' is not a bright one."); *Valiente v. Eulen Am., Inc.*, No. 18-23597-CIV, 2019 U.S. Dist. LEXIS 248596, 2019 WL 13255738, at *3 (S.D. Fla. Feb. 15, 2019). Under binding Fifth Circuit precedent, it is particularly inappropriate to award summary judgment in a case of employment discrimination where the court must decide "whether the defendants have discriminated on the basis of race or national origin because "in some contexts, national origin discrimination is so closely related to racial discrimination as to be indistinguishable." *Bullard v. Omi Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. 1981)[6]

Although Cagle did harass Moeinpour on a regular basis based on her national origin, including calling her an "Iranian" liar and demanding that she go back to her "country," Cagle did not limit her harassment to "national origin" based harassment.  She also called Moeinpour a "sand nigger" on a regular basis and harassed her about her name and accent, as well as her ability to speak English. Arguably the most egregious of Cagle's harassment, showing Moeinpour the butt of a gun and telling her this is what Americans due with "sand niggers," is a threat to kill her not because she is from Iran, but because of an ethnic characteristic. All of these forms of harassment relate to ethnic characteristics of a Middle Eastern individual, not necessarily an *Iranian citizen*. Cagle simply ignores all of this evidence of ethnic/race-based harassment of Moeinpour in arguing

---

[6] *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981).

that her claims are solely based on "national origin." Moeinpour's evidence, when taken in its entirety, supports that she was harassed by Cagle based on *both* her national origin and race and not solely due to her national origin or religion as required to pursue a claim under 1981. *See, e.g. Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 230 (D.N.J. 2014) (denying summary judgment under 1981 because "discrimination based upon a person's accent may constitute national origin discrimination and/or racial discrimination"); *Swan v. City of Toledo*, No. 3:07 CV 3810, 2009 U.S. Dist. LEXIS 149448, at *4 (N.D. Ohio Feb. 23, 2009) (denying summary judgment on 1981 claim because use of the term "sand nigger" supported race-based hostile environment claim)

### B. MOEINPOUR HAS EVIDENCE THAT CAGLE INTERFERED WITH HER EMPLOYMENT BY CREATING A HOSTILE ENVIRONMENT BASED ON HER RACE THAT ULTIMATELY RESULTED IN HER TERMINATION IN VIOLATION OF § 1981.

In this Circuit, as noted by the Defendant, "a third party's interference with those rights guaranteed under Section 1981 will subject such a person to personal liability." *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975) As set out above, § 1981 clearly encompasses a party's right to "performance" of the contract. Cagle has again, as she did in her Motion to Dismiss the Plaintiff's Complaint, failed to even address the Plaintiff's claim that Cagle's personal campaign of race-based harassment interfered with her ability to perform her employment contract by creating a hostile work environment regardless of her authority over Moeinpour's employment as a "non-supervisor." Under the clear language of the statute itself, as well as opinions from other jurisdictions, an individual who personally engages in a campaign of hostile environment harassment based on race can be held personally responsible for her own actions.

To establish a claim for individual liability under § 1981, courts have held that a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action."

*Allen v. Denver Pub. Sch. Bd*., 928 F.2d 978, 983 (10th Cir. 1991), *overruled on other grounds*, *Kendrick v. Penske Transp. Servs., Inc*., 220 F.2d 1220, 1228 (10th Cir. 2000); *see also Patterson v. County of Oneida, N.Y*., 375 F.3d 206, 229 (2d Cir. 2004) (*quoting Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 75 (2d Cir. 2000)). The claim must be "predicated on the actor's personal involvement." *Allen*, 928 F.2d at 983. The Second Circuit has held that "individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004).

Cagle was most certainly "personally involved" in her own race-based harassment of Moeinpour and her continuous manufactured, false complaints regarding Moeinpour to get her fired from UAB. Cagle's actions were particularly egregious, including threatening to shoot Moeinpour on UAB's campus because "this is what we Americans do to sand niggers," manufacturing numerous complaints (both in her own name and anonymously) with the specific intent of getting Moeinpour fired. Personal involvement in such egregious, race-based harassment with the intent to get Moeinpour fired and to make it impossible for her to perform her job free from racial harassment sufficiently supports Moeinpour's' claim against Cagle under § 1981. *See Patterson,* 375 F.3d at 230 (holding co-worker participation in one egregious incident that included both racial remarks and a physical assault sufficient to for individual liability under 1981); *see also Francis v. Atlas Machining & Welding, Inc.*, No. 11-6487, 2013 U.S. Dist. LEXIS 20691, at *14 (E.D. Pa. Feb. 14, 2013) (holding coworkers who harassed the plaintiff by using racial slurs and other race-based harassment can be held personally liable for their conduct under 1981).

Although this circuit *has* clearly held that a third party can be held liable for personally violating § 1981 in *Faraca*, nothing in that opinion limits it to supervisory employees as intimated by the

Defendant in her argument. Defendant's argument in support of her Motion for Summary Judgment suffers from the same flaws as her Motion to Dismiss: *all* the cases cited by Cagle deal only with co-worker responsibility for 1981 violations based on a disparate treatment theory and *not* the situation here – a coworker engaging directly in the creation of a hostile environment that interferes with the plaintiff's right to perform a contract (employment) free of racial harassment. In the world of disparate treatment, whether a co-worker has "supervisory" authority to influence or make the employment decision at issue (termination, discipline) makes perfect sense. If a racist co-worker has no supervisory authority, she did not cause a specific discriminatory employment action that can be taken only by an employer. A co-worker, however, *is* fully capable of creating a racially hostile working environment that directly interferes with someone's ability to do her job in violation of 1981. And that is exactly the case here.

Cagle intentionally and purposefully interfered with Moeinpour's ability to perform her contract of employment with UAB by subjecting her to an ongoing hostile working environment by harassing her due to her race and can be held personally responsible for her own conduct in violating § 1981.

## IV.    CONCLUSION

Cagle's Motion for Summary Judgment is therefore due to be denied.

Respectfully submitted this the 20th day of November, 2023.

s/ Teri Ryder Mastando
Teri Ryder Mastando (ASB-4507-E53T)
Eric J. Artrip (ASB-9673-I68E)
MASTANDO & ARTRIP, LLC
301 Holmes Ave, Suite 100
Huntsville, Alabama 35801
Phone: (256) 532-2222
Fax:         (256) 513-7489
artrip@mastandoartrip.com
teri@mastandoartrip.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of November, 2023, I electronically filed the foregoing with the Clerk of the Court and have served a copy of same  upon the following via electronic service, facsimile or by placing a copy of same in the United States mail, postage prepaid and properly addressed.

David Mellon, Esq.
Emily Traylor Vande Lune, Esq.
Spencer A Kinderman, Esq.
UAB OFFICE OF COUNSEL
*Attorneys for Kelly Mayer and Board of Trustees of The University of Alabama*
1720 2nd Avenue South, Suite AB 820
Birmingham, AL 35294-0108
Email: drmellon@uasystem.edu
            evandelune@uasystem.edu
            skinderman@uasystem.edu

Daniel B. Harris, Esq.
Dion Y Kohler, Esq.
Parsa Fattahi, Esq.
JACKSON LEWIS
*Attorneys for Kelly Mayer and Board of Trustees of The University of Alabama*
800 Shades Creek Parkway, Suite 870
Birmingham, AL 35209
Email: daniel.harris@jacksonlewis.com
            Dion.Kohler@jacksonlewis.com
            parsa.fattahi@jacksonlewis.com

Anne R Yuengert, Esq.
Cortlin Lee Bond, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
*Attorney for Defendant Mary Jo Cagle*
1819 5th Avenue North
Birmingham, AL 35203
Email: ayuengert@bradley.com
            cbond@bradley.com

s/ Teri Ryder Mastando
Teri Ryder Mastando