FILED

2024 May-14  PM 03:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **FARIBA MOEINPOUR,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:21-cv-01302-RDP** |
| | } | |
| **BOARD OF TRUSTEES OF THE** | } | |
| **UNIVERSITY OF ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the Motions for Summary Judgment filed by (1) the Board of Trustees of the University of Alabama ("UAB") (Doc. # 94);[1] (2) Mary Jo Cagle (Doc. # 85); and (3) Kelly Mayer[2] (Doc. # 86). The Motions have been fully briefed and are ripe for review. (Docs. # 84-90, 94, 96-98, 101-103, 106-107). For the reasons discussed below, UAB's Motion is due to be granted in part and denied in part; Cagle's Motion is due to be denied; and Mayer's Motion is due to be granted.

## I.       BACKGROUND

The facts set out in this section are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party, although factual disputes are acknowledged. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the facts that could be established

---

[1] Plaintiff sues the Board of Trustees for the University of Alabama system ("Board of Trustees"). However, the alleged discrimination occurred at the University of Alabama at Birmingham ("UAB"). Thus, for the sake of clarity, the court will refer to Defendant Board of Trustees as UAB.

[2] For ease of reference, the court will refer to Defendants Cagle and Mayer by their last names, and to UAB, Cagle, and Mayer collectively as "Defendants."

through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Plaintiff Fariba Moeinpour filed claims against Defendants under Title VII of the Civil Rights Act of 1964, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1981.[3] Plaintiff asserts that, over the course of nine years, UAB, Cagle, and/or Mayer discriminated and harassed her based on her race and national origin and retaliated against her. (Doc. # 1).

A.      **The Chemoprevention Center**

UAB is a public research university and academic medical center located in Birmingham, Alabama. (Doc. # 87-1 at ¶ 3). UAB operates various research centers funded by grants and other contracts. (*Id.* at ¶ 3; Doc. # 87-2 at 39, 47-53). Each center has employees, research assistants, and a lead Principal Investigator ("PI"). (*Id*).

Plaintiff was originally hired in 2005 to work as a research assistant in a center led by Dr. Irshaud Chaudry. (Doc. # 87-3 at 128). In February 2011, after being placed on administrative leave following her report of misappropriations in Dr. Chaudry's lab, Plaintiff began working as the PI in the Chemoprevention Center ("CP Center") with Dr. Clinton Grubbs. (*Id.* at 134-35). The CP Center was primarily funded by contracts from the National Cancer Institute ("NCI") and conducted the research specified in the contracts. (Doc. # 87-2 at 49-56). To support Grubbs's research efforts under the contracts, NCI provided funds to UAB who in turn paid Grubbs and any support staff approved under the contract. (*Id.* at 59-65).

The CP Center had offices in two separate buildings on UAB's campus – Volker Hall and the Webb Building. (*Id.* at 99, 140). Certain laboratory areas were located in Volker Hall (*Id.* at

---

[3] Claims against a state actor for violation of Section 1981 must be asserted under section 1983. *Bryant v. Jones,* 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009). Accordingly, Plaintiff brings this action against Mayer, as a state actor, and against Cagle, to the extent she is considered a state actor, under both 42 U.S.C. §§ 1981 and 1983. (Doc. # 1).

137), as were the following employees: Dr. Grubbs (*Id.* at 129); Cagle and Jeanne Hale, who provided administrative services (*Id.* at 102); and Plaintiff, Julie Gray, and Nour Sukar, who conducted research within the lab. (*Id.* at 102, 103, 167). The remaining CP Center employees worked in the Webb Building, which also housed the animal testing facilities. (*Id.* at 138-39).

### B.      Plaintiff's Interactions with Cagle

After Plaintiff joined the CP Center, in 2011 and 2012, Plaintiff and Cagle made numerous complaints about each other. (Docs. # 87-9 at 80-82, 116, 126-27; # 87-10 at 63-64). The tension between the women seemed to begin when Cagle ordered the wrong testing supplies for the laboratory and Plaintiff went directly to Grubbs to have the issue corrected. (*Id.*; Docs. # 87-7 at 46; # 87-10 at 29-31; # 87-11).

In June 2011, Cagle, Gray, and Hale complained about Plaintiff to UAB's Human Resources Department ("HR"). (Docs. # 87-9 at 80-82, 90-91, 116). They reported that Plaintiff: (1) made false accusations against Cagle; (2) had an inappropriate romantic relationship with Grubbs; (3) recorded Cagle, Hale, and Gray with a pen-recorder; and (4) made unsolicited comments about a misconduct investigation surrounding Dr. Chaudry's lab. (*Id.*; Docs. # 87-11; # 87-12; # 87-7 at 49, 74-75, 79-80). Around the same time, Plaintiff complained about Cagle to HR. (Docs. # 94-6 - 94-9). Plaintiff claimed that Cagle: (1) stalked her; (2) harassed her; (3) called her a "slut" and made comments about Grubbs's sexual and romantic relationships; (4) made fun of Plaintiff's accent and last name; (5) accused Plaintiff of making false allegations against Dr. Chaudry; (6) showed Plaintiff the middle finger; and (7) directed expletives at Plaintiff. (*Id.*; Docs. 87-15; # 87-9 at 89-90, 101, 122).

At the time of these complaints, Anita Bonasera was the Director of Employee Relations, and Mayer was an Employee Relations Representative. (Docs. # 87-13 at 12, 76-77; # 87-9 at 49-

50). Both roles function within HR. (*Id.*). Thus, any complaints at that time were primarily handled by Bonasera, but Mayer and others in HR assisted in the investigations. (*Id.*).

Bonsarra testified that she received anonymous information indicating there may have been some sort of personal relationship between Plaintiff and Grubbs. (Doc. # 87-9 at 105-11). Hale testified that it was "quite evident" that Plaintiff and Grubbs "were having an affair." (Doc. # 87-10 at 36). Cagle agreed. (Docs. # 87-7 at 181-84; # 94-16).

While HR and Bonasera were investigating these issues, Plaintiff sent numerous emails to Bonasera, Mayer, and Grubbs making additional allegations against Cagle. (Docs. # 87-15; # 87-16; # 87-44 - 87-48; 87-50 - 87-53; 94-6 - 94-10; 94-14 - 94-15). On April 4, 2012, Plaintiff sent an email to Bonasera and Mayer summarizing what they had discussed during a meeting earlier that day, including that Cagle had harassed her for being a "Middle Eastern woman of Persian descent and Iranian national origin." (Docs. # 87-16 at 1). In the email, Plaintiff stated that she sent several emails and had several meetings to "put [a] stop to Mary Jo Cagle." (Doc. # 87-16 at 2). Plaintiff also wrote that, because she was the only non-American in the department, Cagle isolated her by making fun of her name and her accent and making derogatory comments about her. (*Id.*). Plaintiff asserted that Cagle had teamed up with others, including two maintenance men, to harass her and she claimed that Cagle told one of the men to bring a BB gun,[4] shoot Plaintiff in the head, and send her head back to her country. (*Id.*).

While the investigation continued, HR and Grubbs attempted to keep Cagle and Plaintiff separated while at work and encouraged them to avoid each other. (Doc. # 87-9 at 120-21). Cagle requested that her office and Hale's office be moved away from Plaintiff because they feared

---

[4] A "BB gun" is a type of airgun that shoots a metal "BB" projectile. Aubrey McShan, *Guide to Airguns: Pellet Guns vs. BB Guns vs. Airsoft Guns*, Academy: Expert Advice (Oct. 5, 2023), https://www.academy.com/expert-advice/pellet-vs-bb-vs-airsoft-guns. They are "designed to penetrate their targets" but "the average BB gun is not powerful enough to deliver a clean shot to most small [wild animals being hunted]." *Id.*

Plaintiff would harm them. (Docs. # 87-7 at 103-104; # 87-17). In May 2012, Cagle and Hale's offices were moved to a different location, away from Plaintiff. (Doc. # 87-17).

On July 31, 2012, Bonasera sent Plaintiff a letter detailing some of the findings of the investigation. (Doc. # 87-18). Ultimately, HR could not substantiate any claims made by either Plaintiff or Cagle, and found that the complaints involved personal disputes regarding the operation of Grubbs's laboratory rather than any "scientific misconduct issues." (*Id.* at 2-3).

After the conclusion of the investigation, Plaintiff testified that Cagle did the following: regularly spat on her clothes and shoes (Doc. # 87-3 at 212-14); followed Plaintiff when she was experimenting in a different lab (Doc. # 87-4 at 557-58); and screamed in Plaintiff's neighborhood that Plaintiff could not speak English (*Id.* at 695-99). In August 2012, Plaintiff emailed Grubbs to report that her work had been interrupted and she had been distracted by Cagle, Hale, Gray, Mayer, Bonasera, and Chris Meeks, the department administrator. (Docs. # 87-13 at 49; # 94-14). Her email included no details. (Doc. # 94-14). In September 2012, Plaintiff sent another email to Grubbs complaining that Cagle's alleged harassment of her continued. (Doc. # 94-15). She accused Cagle of defaming her character, harassing her in public, calling her a liar, and claimed that Cagle's office being moved did not prevent Cagle from harassing Plaintiff. (*Id.*).

Plaintiff's daughter, Nicki Lawsen, testified that between 2015 and 2019, Cagle harassed Plaintiff outside of work. (Doc. # 87-21 at 80-86). In 2015 or 2016, Lawsen and Plaintiff were shopping at The Summit Birmingham ("The Summit"), an outdoor retail complex, and claim that Cagle drove directly towards them. (Doc. # 87-21 at 80-81). On another occasion, in 2018, when Lawsen and Plaintiff were once again at The Summit, Cagle followed them around while they were shopping and followed so closely behind them that bystanders asked if they needed assistance. (*Id.* at 82-86). In May 2019, again at The Summit, Cagle allegedly followed Plaintiff and her daughter while they were shopping, called them "shits," and used other expletives. (*Id.* at

86-90). During this same encounter, Lawsen testified that Cagle followed her into the ladies bathroom and stood outside her stall before following her and Plaintiff around the store as they continued to shop. (*Id.* at 90-95).

Plaintiff testified that Cagle called her a "sand nigger" on numerous occasions between 2018 and 2020. (Doc. # 87-3 at 92). On September 10, 2019, Plaintiff emailed Mayer to complain that Cagle confronted her in the UAB parking deck, showed her the handle of a gun, and called her a "sand nigger." (Doc. # 87-3 at 37). Lawsen testified that, on December 23, 2019, Cagle again followed her and Plaintiff around a store at The Summit while they shopped and that, as they left the store, Cagle called them "sand N-words." (Doc. # 87-21 at 107-11).

Plaintiff is clear that the final instance of Cagle's harassment of her occurred on February 10, 2020. (Docs. # 1 at 12, # 87-41 at 3,  # 94-4 at 4). During this incident, Cagle began to stalk Plaintiff as she walked to the bathroom, causing Plaintiff to step into Grubbs's office to make a complaint rather than continue to the bathroom. (*Id.*).

### C.      Plaintiff's Arrest and Termination

At some point prior to February 12, 2020, Grubbs had told Plaintiff that his life was in danger because Cagle was associated with the mafia and hit men would kill him if he reported any misconduct by her (Cagle). (Docs. # 87-5 at 845-47; # 87-2 at 395-98; 409-11).[5]

On February 12, 2020, Plaintiff invited Grubbs to her office. (Doc. # 87-5 at 845). She had a digital tape recorder in her drawer and secretly recorded the conversation. (*Id.* at 845-46). She prompted Grubbs to repeat a story he had told her that Cagle had sent four guys to his house to kill him. (*Id.* at 845-49). Plaintiff recorded this conversation. (*Id.*). Grubbs said that he had told Cagle he would fire her "if she doesn't stop" her animosity toward Plaintiff, and Cagle responded, "You

---

[5] In his deposition, Grubbs testified that the story he told Plaintiff about Cagle's alleged mafia connections was not true. (Doc. # 87-2 at 395:18-398:3; 409:3-411:18).

may get another visitor if you try to fire me." (*Id*.; Doc. # 87-22). Grubbs told Plaintiff that Cagle and the men were part of the mafia. (*Id*.).

That evening, Grubbs and Plaintiff had a conversation at Plaintiff's house. (Doc. # 87-5 at 854). Plaintiff discussed her plan to report Cagle's conduct to the chair of the department, Dr. Herbert Chen. (*Id*.). Grubbs discouraged that. (*Id*. at 854-55). Grubbs repeated his story about Cagle's alleged mafia involvement, mentioning that Cagle was dangerous, and that Plaintiff's life might be in danger if she reported Cagle. (*Id*. at 854-56).

The next morning, February 13, 2020, Plaintiff and Grubbs spoke in Plaintiff's office. (Docs. # 87-5 at 862-63; # 87-2 at 374-75). Grubbs testified that Plaintiff told him that she had already gone to Dr. Chen about him, and that Grubbs would be fired. (Doc. # 87-2 at 374-76). Plaintiff testified that she wanted to talk to Grubbs and that they should go see Dr. Chen together. (Doc. # 87-5 at 868). Grubbs refused to accompany Plaintiff to see Dr. Chen. (*Id*. at 872-74). Grubbs picked up the phone, called a number, and said "we have a disturbance here." (*Id*. at 877). He then called the police. (*Id*. at 878). Plaintiff got up to go see Dr. Chen. (*Id*. at 885-86). Plaintiff claims Grubbs told her to shut her mouth, and pushed her causing her to fall. (*Id*.). The next thing Plaintiff knew, Grubbs was on top of her. (*Id*. at 907-10). She says Grubbs grabbed her chin and then grabbed her crotch. (*Id*. at 912-13).

Grubbs presents a different account. He testified that Plaintiff was the aggressor. (Doc. # 87-2 at 374-76). She assaulted him and refused to let him leave the room and slapped his face. (*Id*.).

The police arrived soon after these events, spoke with Plaintiff and Grubbs, and took photos of both of them. (Docs. # 87-5 at 919-20, 922-33; # 87-2 at 376-78). The police determined that Plaintiff was the aggressor in the incident. (Doc. # 87-23). The police report states that Grubbs reported to the police that he and Plaintiff had been in a relationship in the past and he was not

going to press charges. (*Id.*). Nonetheless, Plaintiff was arrested and charged with Domestic Violence in the Third Degree. (*Id.*; Doc. # 94-4 at 6).

Following Plaintiff's arrest, Tammie Collins, who served as the HR representative for the School of Medicine, investigated the events immediately preceding the altercation and arrest. (Doc. # 87-24 at 14, 20). HR obtained both a written statement from Grubbs and the police report. (Docs. # 87-24 at 19-20, 24; # 87-2 at 37; # 87-25). Collins testified that she never had the chance to speak with Plaintiff about the incident. (Doc. # 87-24 at 18-19).

In her deposition taken on November 30, 2022, Plaintiff testified that she was in jail on February 13, 2020, and was released on Friday, February 14, 2020 at about 4 or 4:30 in the afternoon. (Doc. # 87-5 at 955-56). Plaintiff does not recall if Monday, February 17 was a normal workday for her. (*Id.* at 956). She testified that she went to find a criminal attorney that day. (*Id.*).

On February 14, 2020, neither Plaintiff nor Grubbs was at work. (Doc. # 87-2 at 383). Plaintiff was in jail. (*Id.*). Although Grubbs returned to work on February 17, 2020, Plaintiff did not. (*Id.* at 383-84). Grubbs submitted his resignation on February 17, 2020. (*Id.* at 383-84). Grubbs stayed on at UAB until March 31, 2020 because he had to close out contracts. (*Id.* at 390). Once Grubbs no longer worked at UAB, the CP Center closed. (Doc. # 87-2 at 390).

On February 18, 2020, a recommendation was made to terminate Plaintiff's employment because she had admitted to striking her supervisor on the face and had been absent without contacting UAB for at least three days. (Docs. # 87-29 at 126-28; # 87-38). Multiple people were involved in drafting the termination letter, including Collins, Williams, Chen, Moore, and LaKisha Mack (the Senior Associate Dean of the School of Medicine). (Doc. # 87-29 at 50-51). Plaintiff's employment was terminated effective February 18, 2020. (Docs. # 87-38; #87-29 at 84). The memorandum to Plaintiff informing her of her termination was dated February 18, 2020 and was

initialed by Chen and Moore. (Docs. # 87-38). Grubbs was not consulted about the termination of Plaintiff's employment and did not participate in that decision. (Doc. # 87-2 at 389-90).

UAB did not hear from Plaintiff until the afternoon of Tuesday, February 18, 2020, when it received an email from a law clerk at the Revill Law Firm stating that the firm represented Plaintiff. (Docs. # 87-29 at 86-87; # 87-31). But, that email was received *after* the decision to terminate Plaintiff's employment had already been made. (*Id*.).

In the undated declaration submitted in response to Defendants' Motions for Summary Judgment filed on November 20, 2023, Plaintiff averred that, on February 10, 2020, before the stalking incident with Cagle, Grubbs told her there was no need for her to work February 14 or 17, 2020. (Doc. # 94-4 at ¶ 29). She stated that around the time she was fired she was only working on Fridays or holidays if there was a grant deadline or an experiment that required completion. (*Id*.).

### D.      Plaintiff's EEOC Charge

Plaintiff filed her charge of discrimination with the EEOC on Tuesday, August 11, 2020. (Doc. # 87-41). The EEOC issued a Notice of Right to Sue letter on June 30, 2021. (Doc. # 1). Plaintiff filed the present lawsuit on September 28, 2021, ninety days after the Notice of Right to Sue was issued. (*Id.*).

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes

demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c), a plaintiff may not simply rest on the allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. 477 U.S. at 248, 252 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'") (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Summary judgment may be granted if the non-moving party's "evidence [] is 'merely colorable' or [] 'not significantly probative.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (quoting

*Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "At summary judgment, the key issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Butler v. Gualtieri*, 41 F.4th 1329, 1334 (11th Cir. 2022) (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the movant would bear the burden of proof at trial,

> [the movant] must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick*, 2 F.3d at 1115 (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## III.   DISCUSSION

Plaintiff's Complaint asserts the following claims:

1. A race/national origin harassment claim in violation of Title VII against UAB;

2. A retaliation claim in violation of Title VII against UAB;

3. A race/national origin harassment claim in violation of Title VI against UAB;

4. A retaliation claim in violation of Title VI against UAB;

5. A race/national origin harassment claim in violation of Section 1981 (via Section 1983) against Mayer in her individual capacity; and

6. A race/national origin harassment claim in violation of Section 1981 (via Section 1983) against Cagle in her individual capacity.

The court will analyze each of Plaintiff's claims, in turn.

## A. Count I - Plaintiff's Hostile Work Environment Claim Against UAB Under Title VII

UAB argues that it is entitled to summary judgment on Plaintiff's Title VII hostile work environment claim because the claim is time-barred. (Doc. # 88 at 19-22). To assert an actionable Title VII claim, a plaintiff must file a timely EEOC charge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002). "In a non-deferral state such as Alabama, the deadline for filing a charge is 180 days after the alleged discriminatory act." *Zeigler v. Ala. Dep't of Human Res.*, 710 F. Supp. 2d 1229, 1238 (M.D. Ala. 2010) (citing *Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005) and 42 U.S.C. § 2000e-5(e)(1)).

In *National Railroad Passenger Corporation v. Morgan,* the Supreme Court considered "whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside the statutory time period" of either 180 or 300 days for filing an administrative charge with the Equal Employment Opportunity Commission. 536 U.S. 101, 104-05 (2002). The Court explained that "[p]rovided that *an act* contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117 (emphasis added). The Eleventh Circuit has held that a hostile work environment claim should be reviewed in its entirety, so long as *one* of the events comprising it fell within the statute of limitations." *Shields v. Fort James Corp*., 305 F.3d 1280, 1281-82 (11th Cir. 2003) (emphasis added).

Plaintiff made clear in her Complaint (Doc. # 1), in her EEOC Charge (Doc. # 87-41), and in the declaration she filed in response to the Motions for Summary Judgment (Doc. # 94-4) that

12

Cagle was responsible for creating the alleged hostile environment on the basis of her race and national origin. Plaintiff was also clear in the Complaint (Doc. # 1 at ¶ 38), in her EEOC Charge (Doc. # 87-41), and in the declaration she filed in response to the Motions for Summary Judgment (Doc. # 94-4 at ¶ 29) that the last incident of harassment by Cagle occurred on February 10, 2020.

One hundred and eighty days after February 10, 2020 was Saturday, August 8, 2020.[6] Therefore, the deadline for Plaintiff to file her EEOC charge asserting a hostile environment based on Cagle's harassment was no earlier than Monday, August 10, 2020. *Ledbetter*, 421 F.3d at 1178. But, Plaintiff filed her Charge of Discrimination with the EEOC on Tuesday, August 11, 2020. (Doc. # 87-41). No events comprising the hostile environment based on race or national origin created by Cagle occurred within the one-hundred eighty days preceding the filing of her EEOC charge. (Docs. # 1 at ¶ 38; # 87-41; # 94-4 at ¶ 29). Therefore, Plaintiff's EEOC charge was untimely as to her hostile environment claim.

In response to UAB's Motion for Summary Judgment on this issue, Plaintiff argues that Cagle continued to harass her after February 10, 2020. (Doc. # 98 at 33). This argument, however, is clearly contradicted by the undisputed Rule 56 record in which Plaintiff made it abundantly clear that the last incident of harassment by Cagle occurred on February 10, 2020. (Doc. # 1 at ¶ 38; # 87-41; # 94-4 at ¶ 29).

Plaintiff also argues that, even though she never returned to work after her arrest, Cagle "harassed" her when Cagle was interviewed by Collins on February 17, 2020. (Doc. # 33). However, incidents about which Plaintiff was not aware during her employment could not have contributed to the hostile environment she claims to have experienced. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1257 (11th Cir. 2014) (citing *Edwards v. Wallace Cmty. Coll.*, 49 F.3d

---

[6] https://www.timeanddate.com/date/dateadded.html?m1=02&d1=10&y1=2020&type=add&ay=&am=&aw=&ad=180&rec= (last visited April 17, 2024).

1517, 1522 (11th Cir. 1995) ("[S]ome of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile work environment.")).

Plaintiff also asserts that the altercation between her and Grubbs on February 13, 2020 and the termination of her employment on February 18, 2020 were a continuation of the hostile environment. However, neither of these events are related to the race and/or national origin harassment by Cagle.

Although in the context of addressing the converse situation than that presented here, the Eleventh Circuit has observed that "discrete discriminatory [] acts[] are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1349-50 (11th Cir. 2007) (citing *Morgan*, 536 U.S. at 113). Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire," and are each easy to identify. *Morgan*, 536 U.S. at 114. "Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim." *Chambless*, 481 F.3d at 1350.

Thus, to determine whether Plaintiff's Title VII hostile environment claim is timely, the court must ask this question: are the discrete acts that are alleged to have occurred within the 180-day period sufficiently related to Cagle's harassment so as to be part of the same hostile work environment claim? *Id.* In other words, has Plaintiff shown that the events before and after February 13, 2020 were of the same type of "discriminatory intimidation, ridicule, or insult." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Again, as she herself presented in her EEOC charge, judicial complaint, and sworn declaration, Plaintiff's hostile environment claim is based exclusively on the acts of Cagle. (Doc.

14

# 1 at ¶ 38; # 87-41; # 94-4 at ¶ 29). Her altercation with Grubbs on February 13, 2020 was simply not the same type of "discriminatory intimidation, ridicule, or insult" as the harassment by Cagle based on her race and/or national origin. *Chambless*, 481 F.3d at 1350. Plaintiff's altercation with Grubbs, even when viewed through her own allegations, was an argument between Plaintiff and Grubbs in which Grubbs grabbed Plaintiff's chin, pushed her down, and groped her groin area. The harassment by Cagle consisted primarily of offensive and insulting comments about Plaintiff's race and/or national origin, and threats directed to her. According to Plaintiff, Cagle's conduct had a discrete end date, which was more than 180 days before she filed her EEOC charge.[7]

Similarly, Plaintiff's termination was not the same type of "discriminatory intimidation, ridicule, or insult" as the alleged harassment by Cagle based on her race and/or national origin. *Id*.[8]

For all these reasons, UAB is entitled to summary judgment on Plaintiff's Title VII harassment claim because Plaintiff failed to exhaust her administrative prerequisites for that claim.

## B.    Count II - Plaintiff's Retaliation Claim Against UAB Under Title VII

Count Two of Plaintiff's Complaint identifies two instances of alleged retaliation: (1) Grubbs telling Plaintiff the story suggesting that Cagle had mafia connections (Doc. # 1 ¶ 65); and (2) UAB having Plaintiff arrested. (Doc. # 1 ¶ 66).[9]

---

[7] In response to UAB's Motion for Summary Judgment, Plaintiff appears to argue that the altercation with Grubbs constituted a retaliatory hostile environment. (Doc. # 98 at 32, 34). However, Plaintiff asserted no such claim in her Complaint. "'A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.'" *Plair v. Interactive Communications International, Inc., et al.*, 2024 WL 1480406, at *2 (11th Cir. Apr. 5, 2024) (quoting *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam)).

[8] Moreover, whether Plaintiff was subjected to a work environment that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment is called into question by emails Plaintiff sent that discussed how much she enjoyed her research, that she enjoyed working in the CP Center, and that Grubbs encouraged her in reporting her complaints against Cagle directly to HR. (Docs. # 87-48; # 87-15 at 2, 5, 7, 8, 10-11; # 87-16; # 87-44; # 87-47; # 87-49; # 94-7; # 94-14).

[9] In response to UAB's Motion regarding her retaliation claim, Plaintiff again asserts that she was also subjected to a retaliatory hostile environment, but no such claim was asserted in the Complaint. (Doc. # 98 at 37).

Under the modified *McDonell Douglas* framework, to succeed on a Title VII retaliation claim, Plaintiff "must first make out a prima facie case of retaliation, showing (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Patterson v. Ga. Pacific, LLC*, 38 F.4th 1336, 1344-45 (11th Cir 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020)). If the plaintiff can make that showing, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the [alleged] retaliation." *Patterson*, 38 F.4th at 1345. "If the employer does, the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation." *Id*.

"An employee's complaint about discrimination constitutes protected activity if the employee could 'reasonably form a good faith belief that the alleged discrimination existed.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (quoting *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999)). A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020). "Termination is a materially adverse action." *Jefferson*, 891 F.3d at 924.

Usually, the key summary judgment question a court faces in assessing a retaliation claim under Rule 56 is whether there was a causal relation between protected activity and an adverse action. The Eleventh Circuit recently examined Supreme Court precedent and explained Plaintiff's burden this way: "In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Knox v.*

---

Again, Plaintiff may not amend her Complaint in response to UAB's summary judgment brief. *Plair*, 2024 WL 1480406, at *2; *Gilmour*, 382 F.3d at 1315.

*Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) (citing *Nassar*, 570 U.S. at 362 (2013)) (internal quotes omitted).

However, "the *McDonnell Douglas* framework is not the only way to prove retaliation." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023). A plaintiff may also use circumstantial evidence to prove retaliation "so long as the evidence raises a reasonable inference of retaliatory intent." *Id.* The Eleventh Circuit has identified three, non-exclusive categories of circumstantial evidence that can raise a reasonable inference: "[1] evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; [2] evidence of systemically better treatment of similarly situated employees; or [3] evidence that the employer's justification for its action is pretextual." *Id.* at 1311.

### 1.      Plaintiff's Arrest

Plaintiff argues the court should not rely on the *McDonnell Douglas* framework in analyzing her retaliation claim. Plaintiff was arrested at work by the UAB Police Department. (Doc. # 87-23). Her arrest followed a dispute with Grubbs, which escalated into a physical altercation. Plaintiff claims the genesis of the dispute with Grubbs was her complaint (either planned or already-made) about Cagle's race- or national origin-based harassment to Dr. Chen and Grubbs's refusal to go with her to support her in making that complaint. The dispute escalated, Grubbs called for security, and Plaintiff was arrested.

According to Plaintiff, her arrest raises an inference of retaliatory intent because the officer who arrested her was an employee of UAB and Grubbs claimed to have control over the UAB Police Department. But, there is no evidence in the Rule 56 record that Grubbs had the power to control, nor that he actually controlled, the UAB Police Department. Nor is there any evidence that the UAB police who made the arrest had any knowledge of Plaintiff's plan or desire to complain about Cagle and arrested her for that reason. *See Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d

712, 716 (11th Cir. 2002) (holding that, in order to show a causal connection between protected conduct and retaliation, a plaintiff need only show "that the decision-makers *were aware of the protected conduct*, and that the protected activity and the adverse actions were not wholly unrelated.") (emphasis added). So, the question, properly framed, is whether Plaintiff can advance a claim asserting that Grubbs called the UAB police in order to dissuade her from engaging in protected activity.

Although it is a close call,[10] the court concludes that there is sufficient evidence from which a jury could conclude that Plaintiff's protected activity was a but-for cause of the alleged adverse action by Grubbs, Plaintiff's supervisor. *Knox*, 957 F.3d at 1245; *see also Nasser* 570 U.S. at 362; *Crawford v. Carroll*, 529 F.3d 961, 973 n. 13 (11th Cir. 2008) (noting that *Burlington Northern* "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions").

UAB's Motion for Summary Judgement on Plaintiff's retaliation claim based on her arrest is due to be denied.

## 2.      The Story About Cagle's Mafia Connections

A materially adverse action in the retaliation context is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 67. Plaintiff claims that Grubbs told her that Cagle was part of the mafia. Although Grubbs testified this comment was a joke, Plaintiff contends that he told her the story to scare her and dissuade her from complaining about Cagle's harassment. Therefore, there appears to be a genuine issue of material fact about Grubbs's motivation for telling Plaintiff the story and it

---

[10] The court has serious reservations about this claim and it may be necessary to address it further on a Rule 50 motion.

follows there is sufficient evidence from which a jury could conclude that dissuading Plaintiff from engaging in protected activity was the reason Grubbs told her the mafia story – again, allegedly to dissuade her from complaining about Cagle. Nevertheless, that does not necessarily mean that there is a question to submit to a jury on this subclaim.

Grubbs telling Plaintiff this story about Cagle is precisely the type of trivial action that the Supreme Court has emphasized would not constitute an adverse employment action. *See Burlington Northern*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.") (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under the anti-retaliation statute.)). And, the story did not actually dissuade Plaintiff from making complaints about Cagle.

Because the mafia story does not rise to the level of an actionable employment action in the retaliation context, UAB's Motion for Summary Judgment is due to be granted on the claim about this story.

### C.     Counts III and IV - Plaintiff's Claims Against UAB Under Title VI

Title VI provides in relevant part: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (1964). However, to ensure that Title VI would not "impinge on Title VII," Congress limits the circumstances in which an employment discrimination action may be brought under Title VI. *Johnson v. Transp. Agency, Santa Clara Cnty., Cal.*, 480 U.S. 616, 627 n.6 (1987); *see also Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp. 2d 742, 747 (D. Md. 2012)

("[42 U.S.C. § 2000d-3] ensures that Title VI is not transformed into an avenue for pursuing all employment discrimination claims."). Thus, the only employers that may be liable for employment discrimination under Title VI are those who receive federal funds for the primary purpose of providing employment. 42 U.S.C. § 2000d-3; *see Jones v. Metro. Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1378 (11th Cir. 1982).[11] Courts consider this "primary objective" requirement to be an element of a plaintiff's cause of action under Title VI. *Rogers*, 859 F. Supp. 2d at 748-49.

The question before the court then is whether Plaintiff has presented sufficient evidence that the "primary objective" of the federal funds granted to the CP Center was to provide employment. She has not. The Eleventh Circuit has not addressed this issue, so the court looks to the law developed in other Circuits for guidance. Obviously, the import of these decisions is that they draw a line between cases where a plaintiff may pursue a claim under Title VI, and cases where such a claim cannot be advanced. *See Temengil v. Trust Terr. of Pac. Islands*, 881 F.2d 647, 653 (9th Cir. 1989); *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995) (affirming summary judgment where the plaintiff did not show "the grant was intended primarily to provide employment and not simply to fund various school programs or enrichment activities"); *Rogers*, 859 F. Supp. 2d at 747-51.

In *Temengil*, the plaintiffs -- "Asian and Micronesian citizens [] who worked for the government of the Trust Territory of the Pacific Islands" -- appealed the dismissal of their Title VI claims. 881 F.2d at 653. In addressing whether the plaintiffs had satisfied their Title VI burden, the Ninth Circuit explained:

> Plaintiffs argue that although the primary function of the Trust Territory government was to administer the Trust Territory in such a way to effectuate Micronesian self determination, the only way to do so was by hiring and training Micronesian citizens. Under this extended logic, few programs that employed

---

[11] Although 42 U.S.C. § 2000d-3 applies to federal departments and agencies, the "primary objective" limitation is extended to private actions as well. *Jones*, 681 F.2d at 1378; *see Schwartz v. Berry College, Inc.*, No. CIV.A. 4:96-cv-338-HLM, 1997 WL 579166, at *2-3 (N.D. Ga. 1997).

people would be protected. Further, Plaintiffs' mere assertions do not satisfy their burden to establish that providing employment was a primary purpose of the program.

*Temengil*, 881 F.2d at 653.

Plaintiff argues that "[r]esearch provided for in a federal contract cannot be performed without providing funds for the specific primary purpose of performing the research under a federal contract at a state university like UAB." (Doc. # 98 at 46). She also claims that, because certain contracts included limitations on hiring, providing employment was the primary objective of these federal funds. (*Id.* at 46-47). However, Plaintiff's argument follows the same over-extended logic that the plaintiffs in *Temengil* tried to pursue. Congress obviously did not intend for every federal contract under which employees are hired to be subject to Title VI. After all, the effect of that interpretation would be to create a duplicative, co-extensive Title VI statutory enforcement scheme that runs parallel with Title VII. That was clearly not what Congress intended. Applying Title VI in this broad fashion would, without question, "impinge on Title VII." *Johnson*, 480 U.S. at 627 n.6.

Plaintiff has not presented sufficient *evidence* that the "primary objective" of the federal funds granted to the CP Center was to provide employment. Therefore, Plaintiff's claims are not viable under Title VI and UAB is entitled to summary judgment on Plaintiff's Title VI claims asserted in Counts Three and Four.

### D. Back Pay

UAB also argues that the court should limit Plaintiff's claim for back pay through no later than March 31, 2020 because the CP Center closed at that time, her position was eliminated, and her employment would have been terminated, in any event. (Doc. # 88). Plaintiff argues in response that Grubbs retired because Plaintiff was terminated, and thus his lab would not have closed if she were not terminated. (Doc. # 98).

"Title VII's purpose is to 'make whole' victims of unlawful employment discrimination." *Collins v. Koch Foods, Inc.*, No. 20-13158, 2022 WL 1741775, at *3 (11th Cir. May 31, 2022). Accordingly, successful Title VII claimants are presumptively entitled to backpay starting from the date of the adverse employment action until the date of judgment. *Lantham v. Dep't of Child. and Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999); *see also Collins*, 2022 WL 1741775 at *4.

In the Eleventh Circuit, as the court explained in *Collins*, backpay is determined through a burden-shifting framework:

> The Title VII plaintiff has "the initial burden" to prove economic loss resulting from the adverse employment action. *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1361 (11th Cir. 1982). Once the plaintiff meets this initial burden, the defendant bears the burden of proving by a preponderance of the evidence that some "change in circumstances," such as the elimination of the plaintiff's former position, should limit back pay or front pay. *Muñoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1350 (11th Cir. 2000); *see Walker*, 684 F.2d at 1362 & n.9; *Archambault v. United Computing Sys., Inc.*, 786 F.2d 1507, 1514-15 (11th Cir. 1986).

*Collins*, 2022 WL 1741775, at *4.

Courts may grant summary judgment in favor of a defendant on a plaintiff's request for a remedy if the undisputed facts of the case make the requested remedy unavailable. *See Wallace v. Dunn Const. Co., Inc.*, 62 F.3d 374, 380-81 (11th Cir. 1995) (holding that the district court should have granted partial summary judgment since, given the facts of the case, reinstatement, front pay, and injunctive relief were unavailable remedies).

Here, Plaintiff's surviving claim against UAB sounds in retaliation and relates to Grubbs calling the UAB police. (Doc. # 1 at ¶ 66). Backpay is not an available remedy for this claim. A calculation of backpay runs from the date of an unlawful discharge, failure to hire, or demotion. *See e.g., McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362 (1995). The claims on which Plaintiff may proceed in this action do not involve any of those claims. Indeed, the only claim in Plaintiff's Complaint that would arguably support an award of backpay is the termination claim contained within her Title VI retaliation claim. But, UAB has shown it is entitled to summary

judgment on that claim. Therefore, UAB is entitled to summary judgment on the issue of backpay, but for a different reason than argued in UAB's Motion.

### E.      Claims Under Section 1981 Against Mayer and Cagle

Plaintiff asserts individual liability claims under 42 U.S.C. § 1981 against Defendants Mayer and Cagle for "race/national origin" discrimination. (Doc. # 1 at ¶¶ 86-106). Mayer and Cagle filed separate motions for summary judgment, which were directed at this claim. (Docs. # 85, 86). While they argue that their motions are due to be granted for different reasons, one overarching argument overlaps – that summary judgment is due to be granted because Section 1981 does not cover claims of discrimination based on national origin. Plaintiff does not dispute that Section 1981 only covers race-based discrimination. She argues that she faced discrimination based on her race at the hands of both Mayer and Cagle. Therefore, the court must determine whether Plaintiff's evidence of discrimination constitutes discrimination based on the basis of her race, as opposed to her national origin.

#### 1.      Plaintiff's Claims are Actionable Under Section 1981

In *Saint Francis College. v. Al-Khazraji*, the Supreme Court held that a plaintiff could assert a discrimination claim under § 1981 based on an allegation that he was mistreated because "he was born Arab." 481 U.S. 604, 613 (1987). As the Supreme Court explained:

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*. *Such discrimination is racial discrimination* that Congress intended § 1981 to forbid, *whether or not it would be classified as racial in terms of modern scientific theory*. The Court of Appeals was thus quite right in holding that § 1981, "at a minimum" reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive subgrouping of homo sapiens." It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for § 1981 protection. If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.

*Saint Francis College*, 481 U.S. at 613 (emphasis added). Significantly, in its discussion the Supreme Court expressly identified "Russians" as one type of ethnic group that constituted an identifiable race. *See id*. at 611; *see also Amini v. Oberlin Coll*., 259 F.3d 493, 503 (6th Cir. 2001) (noting that under the broad conception of race established by the Supreme Court in *St. Francis College*, "one can state a cognizable [section] 1981 claim if he can allege discrimination based on any of a number of ethnicities, including: German, Italian, Spanish, Russian, and 'Arab,' to name just a few." (emphasis and alteration added)).

As the Honorable Cecilia Altonaga, the Chief District Judge in the Southern District of Florida, has explained,

> The Eleventh Circuit has adopted this broad construction of race under Section 1981. For example, in *Zaklama v. Mount Sinai Medical Center*, the Eleventh Circuit squarely rejected the defendant's contention that the plaintiff failed to state a claim under Section 1981 for exclusively alleging discrimination based on national origin. 842 F.2d 291, 295 n.2 (11th Cir. 1988).

*Valiente v. Eulen Am., Inc.*, 2019 WL 13255738, at *4 (S.D. Fla. Feb. 15, 2019). Similarly, in *Donaire v. NME Hosp. Inc*., the Eleventh Circuit held that a "[p]laintiff's allegation that he or she was subjected to intentional discrimination because of his or her "ancestry or ethnic characteristics" satisfies the pleading requirements of section 1981." 27 F.3d 507, 509 (11th Cir. 1994) (allowing a claim that hospital "discriminated against 'foreign-born' physicians" to proceed under § 1981, "reject[ing] conclusion that Filipinos cannot be a protected class under § 1981," and "[t]reating the case as one claiming discrimination against Dr. Donaire because of his Philippine ancestry"); *see also Bullard v. OMI Ga., Inc*., 640 F.2d 632, 634 (5th Cir. Unit B 1981) (stating that, "[i]n some contexts, 'national origin' discrimination is so closely related to racial discrimination as to be indistinguishable.") (citing *Spiess v. C. Itoh & Co*., 408 F. Supp. 916, 928 n. 17 (S.D. Tex. 1976)); *Alvarado v. El Paso Indep. Sch. Dist*., 445 F.2d 1011 (5th Cir. 1971)

(holding that complaint by Mexican-Americans alleging racial and ethnic discrimination "clearly states a cause of action" under § 1981).

Applying the expansive scope of the term race that was adopted by the Supreme Court in *Saint Francis College* to the summary judgment facts here, the court must reject Defendants' attempts to recharacterize Plaintiff's race discrimination allegations as sounding in national origin discrimination. *See High v. Wells Fargo Bank*, 2023 WL 2505540, at *6-7 (E.D. Va. March 14, 2023) ("'Trying to draw clear distinctions between someone's ethnicity and national origin can often amount to impossible hairsplitting,' and '[i]n some instances, evidence of discrimination based on national origin may even be "identical as a factual matter" to discrimination based on ethnicity or ancestry.'" (quoting *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 157 (4th Cir. 2018). The Rule 56 evidence indicates that Plaintiff's allegations focus on race discrimination. For example, Plaintiff contends she was called a "sand nigger" on numerous occasions between 2018 and 2020. Although her Title VII claims about these incidents are untimely, she clearly has asserted timely *race* discrimination under Section 1981.

Having resolved this legal question, the court turns to an analysis of the Rule 56 record evidence related to Plaintiff's Section 1981 allegations.

### 2.    Plaintiff's Section 1981 Claim Against Mayer

Plaintiff's Section 1981 claim against Mayer asserts that Mayer permitted Plaintiff to be the victim of discrimination and harassment on the basis of Plaintiff's race (Middle Eastern/Persian). (Doc. # 1 at ¶ 89).

Although the Eleventh Circuit does not appear to have spoken directly on the issue of individual liability under Section 1981, it has "suggested that such liability may exist." *Okwan v. Emory Healthcare Inc.*, 2021 WL 4099236, at *1 (11th Cir. Sept. 9, 2021) (citing *Faraca v. Clements*, 506 F.2d 956, 959-60 (5th Cir. 1975) (affirming judgment holding director of Georgia

Retardation Center individually liable under § 1981); *Burstein v. Emtel, Inc.*, 137 F. App'x 205, 208 (11th Cir. 2005) (finding that an individual who did not participate in a decision not to offer an employment contract to the plaintiff-employee was not liable under § 1981 because he did not participate in the decision)). Other circuits and district courts within this Circuit agree that individual employees may be held liable under Section 1981 in their individual capacities. *See, e.g.*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (recognizing individual liability, but holding that negligence in maintaining an anti-discrimination policy "does not constitute the 'personal involvement' or 'affirmative link' necessary to support a claim of individual liability."); *Johnson v. Fam. Prac. & Inj. Ctr., Inc.*, 437 F. Supp. 3d 1108, 1118 (M.D. Fla. 2020) (considering whether a doctor could be individually liable under Section 1981 in addition to the medical practice to which he belonged).

However, "[i]Individual liability under Section 1981 requires 'personal involvement' in the alleged discrimination and cannot be imposed vicariously. *Malone v. Mr. Glass Doors & Windows Mfg., LLC*, 2022 WL 3159876, at *11 (S.D. Fla. July 15, 2022), *report and recommendation adopted*, 2022 WL 3154198 (S.D. Fla. Aug. 8, 2022) (quoting *Cason Enters, Inc. v. Metropolitan Dade Cnty.*, 20 F. Supp. 2d 1331, 1337 (S.D. Fla. 1998)). As the Second Circuit reasoned, negligence in enforcing workplace policies "does not constitute the 'personal involvement' or 'affirmative link' necessary to support a claim of individual liability." *Whidbee*, 223 F.3d at 75.

Plaintiff argues that Mayer may be held liable under Section 1981 because, although she was not personally involved in harassing Plaintiff, Mayer failed to take remedial action in the face of repeated complaints by Plaintiff about Cagle. But, Plaintiff has not pointed to any binding authority (or even well-reasoned decisions) allowing a Section 1981 claim to proceed against an

individual under similar circumstances. (Doc. # 97 at 17-22). This argument also ignores a number of issues that are particularly relevant to human resources professionals.

First, unlike a court considering a motion for summary judgment, as an HR professional, Mayer does not (and should not) begin an investigation viewing the facts in the light most favorable to the complainant. So, here she cannot simply take Plaintiff's allegations about Cagle at face value. An HR professional's job is to investigate the complaint. When UAB investigated this matter, Cagle flatly denied the conduct alleged by Plaintiff. (*See, e.g.*, # 87-18 at 3). Moreover, Mayer also received (and was required to investigate) complaints about Plaintiff from Cagle. (Docs. # 87-11, 87-12, 94-22). Therefore, Mayer was faced with a "she said/she said" situation. Nothing in that competing narrative compelled her to credit Plaintiff rather than Cagle and take action. Nor does anything in the record suggest Mayer did not conduct a good faith investigation. On this record, she cannot be held individually liable for investigating the facts.

Second, much of the harassment that Plaintiff complained about occurred outside of the workplace. (Doc. # 87-21 at 80-86). Plaintiff has made allegations about behavior in her neighborhood (Doc. # 87-4 at 695-99) and at a shopping mall (Doc. # 87-21 at 80-86). This is not a situation in which Mayer was an owner of the company. (*Cf. Wallace v. DM Customs, Inc. et al.*, Case No. 8:05-cv-00115-TBM, Middle District of Florida, Doc. # 47 at 3). In that case, the plaintiff also asserted there was direct involvement in the unlawful conduct by an individual defendant in "the placing of a noose on [the supervisor/owner]'s Jeep. (*Id.* at 16). There are no similar allegations about Mayer's direct involvement in the alleged harassment.

Admittedly, Plaintiff asserts that Mayer responded in an inappropriate manner to Plaintiff's complaint that Cagle harassed her in the parking deck after work. Nevertheless, this is not the type of personal involvement in the alleged discriminatory treatment that gives rise to individual liability under Section 1981. *See, e.g.*, *Simpson v. Martin, Ryan, Andrada & Lifter*, 1997 WL

542701, at *4 (N.D. Cal. Aug. 26, 1997) ("[a] supervisor's failure to prevent or remedy harassment is not an affirmative link making [the supervisor] personally liable" under § 1981). Therefore, Mayer is entitled to summary judgment on Plaintiff's Section 1981 claim against her.

### 3.   Plaintiff's Section 1981 Claim Against Cagle

Plaintiff's Section 1981 claim against Cagle asserts that she (Cagle) "subjected Plaintiff to severe or pervasive harassment on the basis of her race/ethnicity." (Doc. # 1 at ¶ 98). As discussed above, individuals may be subject to individual liability under Section 1981 predicated on their personal involvement in the alleged discrimination.

Cagle argues that she is not a proper defendant to Plaintiff's Section 1981 claim because she lacked the supervisory or managerial authority over Plaintiff to affect her contract with UAB and exercised no influence over employment decisions related to Plaintiff. (Doc. # 90 at 15). However, the alleged discrimination at issue in Plaintiff's Section 1981 claim against Cagle was harassment, not a discriminatory employment decision in which Cagle did not participate as is discussed in the cases cited by Cagle in her brief. (Docs. # 90 at 15-19). Cagle is the alleged perpetrator of the hostile environment on which Plaintiff bases her claim. That is, she was personally involved in the alleged discrimination (harassment). *See Johnson*, 437 F. Supp. 3d at 1119. In her individual capacity, Cagle may be liable under Section 1981 for discrimination for which she was personally responsible. Therefore, Cagle's Motion for Summary judgment on this claim is due to be denied.[12]

## IV.   CONCLUSION

For the reasons discussed above, UAB's Motion for Summary Judgment (Doc. # 84) is due to be granted as to Counts One, Three, and Four, and on the issue of backpay. However, UAB's

---

[12] To be clear, Cagle cannot be held liable under 42 U.S.C. § 1983 because she was merely Plaintiff's co-worker. "[C]oemployees of [Plaintiff] without any supervisory authority over [Plaintiff] are not liable pursuant to § 1983." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir. 1995).

Motion is due to be denied as to Count Two. Plaintiff's Title VII retaliation claim which must be resolved by a trier of fact. Mayer's Motion for Summary Judgment (Doc. # 86) is due to be granted as to Count Five. Mayer is due to be dismissed from this case. Cagle's Motion for Summary Judgment (Doc. # 85) is due to be denied as to Count Six.

      An order consistent with this Memorandum Opinion will be entered.

      **DONE** and **ORDERED** this May 14, 2024.

_____

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE