FILED
2025 Jan-15  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FARIBA MOEINPOUR,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:21-cv-01302-RDP** |
| | } | |
| **BOARD OF TRUSTEES OF THE** | } | |
| **UNIVERSITY OF ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the Renewed Motion for Judgment as a Matter of Law, New Trial or Remittitur filed by Defendant the Board of Trustees of the University of Alabama (Doc. # 214), the Renewed Motion for Judgment as a Matter of Law, Motion for New Trial, and Motion for Remittitur filed by Defendant Mary Jo Cagle (Doc. # 215), and the Motion for Equitable Relief against UAB filed by Plaintiff Fariba Moeinpour. (Doc. # 217). The Motions have been fully briefed (Docs. # 214, 219, 221, 215, 216, 220, 222; 217, 218, 223) and are ripe for a decision. For the reasons stated below, the motions for judgment as a matter of law and equitable relief are due to be denied, and new severed trials are due to be granted as to UAB and Cagle. In light of the court's determination that Defendants are entitled to new trials, motions for remittitur and for equitable relief are due to be denied as moot.

## I.     Background

Fariba Moeinpour ("Plaintiff") was employed as a researcher by the University of Alabama at Birmingham ("UAB") from 2005 until 2020 and alleges that one of her coworkers, Defendant Mary Jo Cagle ("Cagle"), engaged in race-based harassment against Plaintiff during the course of their employment, which Plaintiff claims interfered with her ability to do her job. (*See* Doc. # 122

at 2-3). Plaintiff is of Persian/Middle Eastern descent. (*Id.*). Cagle denies engaging in any race-based harassment of Plaintiff. (*Id.*).

During the last ten years of her employment at UAB, Plaintiff worked at the UAB Chemoprevention lab under the direct supervision of Dr. Clinton Grubbs. (*Id.* at 3). Cagle worked as an administrative assistant in the Chemoprevention lab. (*Id.*). Beginning in 2011, Cagle and Plaintiff each made complaints about the other, both to Grubbs and to UAB Human Resources. (*Id.*). Beginning in 2012, Cagle's and Plaintiff's offices were located on separate floors. (*Id.*). On February 13, 2020, Plaintiff and Grubbs spoke in Plaintiff's office. (*Id.*). During or immediately after the encounter, Grubbs called the police. (*Id.*). The police interviewed Grubbs and Plaintiff, and then arrested Plaintiff for Domestic Violence in the Third Degree, took her to the UAB emergency room, and then to jail. (*Id.*). She was released on February 14, 2020. (*Id.*). Plaintiff was charged with Domestic Violence in the Third Degree, but this charge was later dismissed with prejudice. (*Id.*).

Plaintiff filed this case in September 2021. (Doc. # 1). In September 2024, the case was tried to a jury. At trial, Plaintiff presented two claims to the jury: (1) she was subjected to severe or pervasive harassment by Cagle based on her race in violation of 42 U.S.C. § 1981, and (2) UAB retaliated against her when Grubbs "attacked" her and called the UAB police to prevent Plaintiff from reporting Cagle's race-based harassment. (*See id.* at 3-9).

At trial, the jury heard Plaintiff testify that when she met Cagle, Cagle responded to Plaintiff's name by asking in front of Dr. Grubbs, "What kind of ass name is that?" and "Is that all your people from your damn country having this ass name?" (Doc. # 208 at 63). Plaintiff testified that Cagle criticized Plaintiff's nationality and that Plaintiff "was called Iranian liar then I was

called sand n****r.[1] I was spit on." (*Id.*). Plaintiff further testified that Dr. Grubbs had "observed many of these incidents." (*Id.*). Plaintiff also testified that she reported to human resources that "[e]very morning as soon as [Cagle] hears my foot step[s], she comes and harass[es] me by saying, Poop, ew." (*Id.* at 153). Plaintiff also testified that Cagle showed her the middle finger on multiple occasions (*id.* at 155), followed Plaintiff closely around the lab so that Plaintiff could not do her work (*id.* at 157-58), and told a coworker within Plaintiff's and Dr. Grubbs's earshot "Scott, bring your beebee gun. We can sho[o]t her head and send it to her country." (*Id.* at 158). Plaintiff and her daughter, Nicki Lawsen, testified that while they were shopping at the Summit mall in Birmingham, Cagle attempted to run them over, and that Plaintiff immediately called Dr. Grubbs to tell him. (*Id.* at 78-79; Doc. # 209 at 124-25). They also testified that Plaintiff reported to Dr. Grubbs that in the spring of 2018, Cagle walked closely behind them in Belk (Docs. # 209 at 126-27; 208 at 79-80), and that on May 5, 2019, Cagle got on the escalator closely behind them after exclaiming, "those shits," followed Lawsen into the bathroom, and then hid inside a clothes rack to watch them. (Docs. # 209 at 127-31; 208 at 84-85).

Plaintiff also testified that in 2019 she was crossing the street with Dr. Grubbs when they saw Cagle who said, "She is a liar. She's a liar," as well as, "She is a sand n****r." (Doc. # 208 at 81). Plaintiff also testified that on September 10, 2019, Cagle showed Plaintiff the handle of a gun inside of a tote bag and said: "This is what we Americans do to a sand n****r." (*Id.* at 86). Plaintiff indicated that she immediately reported this to Dr. Grubbs and said there were no witnesses. (*Id.*). Lawsen testified that Plaintiff would call her when she left work alone and that Lawsen could hear Cagle in the background saying the "sand N-word" repeatedly. (Doc. # 209 at 348-50). Lawsen

---

[1] At trial, unless otherwise noted with terms like "N-word," testimony frequently featured certain racial epithets and expletives. Although these words were said without censorship in the presence of the jury, the court in this written opinion denotes them with the use of asterisks.

and Plaintiff testified that on December 23, 2019, Cagle followed them into the Ann Taylor store and called them similar expletive names. (Docs. # 208 at 90-92; 209 at 344-47). They both testified that they had asked for help from a groundskeeper, Charles Coby. (*Id.*). Plaintiff testified that she also reported this to Dr. Grubbs. (Doc. # 208 at 92-93).

Plaintiff testified that on February 12, 2020, she told Dr. Grubbs that she "would like to go to Dr. Chen and tell Dr. Chen all the race harassment toward me." (Doc. # 208 at 105). The jury listened to and had transcripts available of several conversations that occurred between Plaintiff, her ex-husband Jeff Lawsen, and Dr. Grubbs prior to February 13, 2020. (Doc. # 208 at 111-12). On one transcript Plaintiff states, "I am going to Chen. I am not going to work. I am going to Dr. Chen and Selwyn." (Doc. # 204-8 at 5). The transcript later quotes Plaintiff as saying, "First thing is professionally through Chen. Then Chen going to take the matter. He is not stupid. He is an intelligent guy." (*Id.*).

The jury also heard testimony that on February 13, 2020, Plaintiff intended to "talk to Dr. Chen with my document and my evidence, all the race harassment that [Cagle] did to me." (Doc. # 208 at 114). Plaintiff further testified that on February 13, Dr. Grubbs asked Plaintiff to speak with him in her office. (*Id.*). Plaintiff recounted that Dr. Grubbs told her not to escalate things to Dr. Chen and that Dr. Grubbs would go to his farm and shoot himself if Plaintiff did. (*Id.* at 115). At some point, Dr. Grubbs picked up the office phone and said, "we have a disturbance here." (*Id.* at 116). Plaintiff testified that she told Dr. Grubbs that she had evidence and would go to Dr. Chen on her own, and that Dr. Grubbs said, "I called the police. I can make you arrested, and UAB hates you and you're from that country." (*Id.* at 119).

Plaintiff testified that she told Dr. Grubbs that she was recording him, and that he grabbed her under the chin, pushed her, ended up on top of her, and groped her. (*Id.* at 120-21). It was then

that she slapped him. (*Id.*). Plaintiff testified that the UAB police arrived at her office and asked her if she slapped Dr. Grubbs. (*Id.* at 122). She replied "yes". (*Id.*). Plaintiff testified that she also told the UAB police, "His secretary harassed me . . . . I wanted to go to Dr. Chen, his boss, and he attacked me." (*Id.* at 122-23). Plaintiff testified that she was arrested, taken to a doctor, then taken to jail, and later UAB Emergency where Dr. Erik Hess examined her and found a scratch and some abrasions on her chin. (*Id.* at 126-27; Doc. # 200-31). Plaintiff testified that she was in jail for thirty hours. (*Id.* at 129).

Officer Cyrano Williams testified that he is an officer on the UAB police force and responded to Dr. Grubbs's call on February 13, 2020. (Doc. # 209 at 268-70). Officer Williams testified that he spoke first with Dr. Grubbs who said that Plaintiff had slapped him and that he was her ex-boyfriend. (*Id.* at 66). To clarify, Dr. Grubbs testified that he did *not* tell the police that he had been Plaintiff's boyfriend because that was not true. (Doc. # 210 at 149). Officer Williams said he does not remember asking Plaintiff whether she had been in a romantic relationship with Dr. Grubbs. (Doc. # 209 at 75-76). Officer Williams testified that Dr. Grubbs said that Plaintiff had stood in the doorway of her office to block him from leaving. (*Id.* at 70-71). Dr. Grubbs similarly testified that Plaintiff slapped him hard after he called the police, and that because Plaintiff was trying to block him from leaving, Dr. Grubbs "brushed her off to one side." (Doc. # 210 at 141-42). Officer Williams further testified that Dr. Grubbs said that he did not want Plaintiff to be arrested. (Doc. # 209 at 85). Dr. Grubbs acknowledged this as well. (Doc. # 210 at 151).

The police report, which was read in the presence of the jury, indicated that Dr. Grubbs "stated that he and the defendant were arguing because the defendant went over his head and contacted his supervisor without first contacting him." (Doc. # 209 at 89). Officer Williams further testified that he interviewed Plaintiff, who told him that she slapped Dr. Grubbs because he groped

her as he attempted to leave the room. (*Id.* at 73). Officer Williams also testified that Plaintiff told him she was concerned that Dr. Grubbs was suicidal. (*Id.* at 75). When asked why he decided to believe Dr. Grubbs's version of events and arrest Plaintiff, Officer Williams responded that he saw marks on Dr. Grubbs's face and heard Grubbs say (and Plaintiff admit) that Plaintiff slapped him. (*Id.*).

Plaintiff missed three days of work after she was arrested because she was in jail and later because she was still "upset" from the experience. (Doc. # 209 at 22-23). In 2012, Plaintiff first saw Dr. Adrian Thurstin for therapy. (*Id.* at 92). After seeing Dr. Thurstin for "a while," Plaintiff stopped going to see Dr. Thurstin until June 25, 2022, over two years after the arrest. (*Id.* at 92-93; Doc. # 110). After seeing Dr. Thurstin several times during 2022 and 2023, Plaintiff's next visit to Dr. Thurstin was June 3, 2024, shortly after this case was set for a pretrial conference. (Doc. # 209 at 118-19). Dr. Thurstin diagnosed her with chronic anxiety, avoidant behavior, and hypervigilance, which he viewed as symptoms of post-traumatic syndrome. (*Id.* at 97-99). Dr. Thurstin testified that Plaintiff had told him that she was distressed because of her arrest. (*Id.* at 307-08). Dr. Thurstin also testified that Plaintiff saw him again on August 30, 2024, shortly before the trial on this case, and that she was still experiencing "hypervigilance." (*Id.* at 107).

At the conclusion of the trial, the jury returned a verdict in favor of Plaintiff and against Cagle in the amount of $825,000 ($500,000 in compensatory and $325,000 in punitive) (Doc. # 195), and a verdict in favor of Plaintiff and against UAB in the amount of $3,000,000 (compensatory only). (Doc. # 196).

## II.     Standard of Review

### A.     Renewed Motion for Judgment as a Matter of Law under Rule 50(b)

In reviewing a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, the court draws all reasonable inferences in favor of the non-moving party, does not weigh the evidence or make any credibility determinations, and disregards any "evidence that the jury need not have believed." *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948 (11th Cir. 2018); *see also Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 151 (2000) ("[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.") (citation and quotation marks omitted).

The "court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). In considering the sufficiency of the evidence, "'the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party.'" *McGinnis v. Am. Home Mortg. Servicing, Inc*., 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995)). A court should only "'render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Progressive Emu Inc. v. Nutrition & Fitness Inc*., 787 F. App'x 549, 556 (11th Cir. 2019) (quoting *Gowski v. Peake*, 682 F.3d 1299, 1310-11 (11th Cir. 2012) (in turn citing Fed. R. Civ. P. 50)); *see also Brown v. Ala. Dep't of Transp*., 597 F.3d 1160, 1173 (11th Cir. 2010) ("Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate only if the facts and inferences point [so] overwhelmingly in favor of one party . . . that reasonable people could not arrive at a contrary verdict."); *Christopher v. Florida*,

449 F.3d 1360, 1364 (11th Cir. 2006) (holding that the court must deny a motion for judgment as a matter of law "if there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.").

"District courts seldom enter a judgment as a matter of law, for it is appropriate only when there can be but one reasonable conclusion as to the verdict." *Thomas v. Broward Cnty. Sheriff's Off.*, 71 F.4th 1305, 1312 (11th Cir. 2023) (cleaned up). That is, "[j]udgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Luxottica Group, S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310 (11th Cir. 2019) (cleaned up). The court may "not second-guess the jury or substitute [its] judgment for [the jury's] judgment if [the jury's] verdict is supported by sufficient evidence." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 811 (11th Cir. 2020) (cleaned up).

### B.    Motion for New Trial under Rule 59(a)

The court may grant a motion for "a new trial on all or some of the issues . . . for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312-13 (11th Cir. 2013) (cleaned up). The court may also grant a new trial under Rule 59 if the "damages are excessive, or . . . the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis v. Am. Home Mortgage Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). When considering on appeal a motion for mistrial based on a party's or counsel's

misconduct, we evaluate "the entire argument, the context of the remarks, the objections raised, and the curative instruction" to determine whether the inappropriate remarks were "such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Ruiz v. Wing*, 991 F.3d 1130, 1141 (11th Cir. 2021) (quoting *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988)).

  **C.**  **Motion for Remittitur under Rule 59(e)**

  Federal Rule of Civil Procedure 59(e) permits the court to alter or amend a judgment. Where the jury's award "is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330 (11th Cir. 1999). The court may also reduce the jury's award where "the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008) (cleaned up).

**III.**  **Analysis**

  Below, the court considers the merits of UAB's and Cagle's respective motions, as well as Plaintiff's responses to them.

  **A.**  **UAB's Motion**

    **1.**  **Judgment as a Matter of Law**

  UAB argues that it is entitled to judgment as a matter of law because Plaintiff failed to present sufficient evidence from which a jury could find that UAB arrested her out of a retaliatory motive or is otherwise liable for her arrest. (Doc. # 214 at 2). In response, Plaintiff argues she presented evidence that Dr. Grubbs called the police after Plaintiff made it clear that she intended

to complain about racial harassment, and that this was a but-for cause of Plaintiff's arrest. (Doc. # 219 at 14).

To find whether UAB is entitled to Judgment as a Matter of Law, the court must determine if the jury's verdict against UAB is "supported by sufficient evidence." *Chaney*, 483 F.3d at 1227. "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." *McMillian v. Postmaster General, U.S. Postal Service*, 634 F. App'x 274, 277 (11th Cir. 2015) (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).

Regarding the first element, Plaintiff can show that she engaged in statutorily protected expression under Title VII by presenting evidence that she "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The Supreme Court has read the word "opposition" broadly, noting that the term "oppose" has an ordinary meaning of "[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand." *Crawford*, 555 U.S. at 276 (quoting Webster's New International Dictionary 1710 (2d ed. 1957)). To establish protected conduct under the opposition clause, Plaintiff must first "show[] that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Howard v. Walgreen Co.*, 605 F.3d 1238, 1244 (11th Cir. 2010) (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

Plaintiff therefore first needed to present sufficient evidence to convince a jury that she had a good-faith, reasonable belief that she had been harassed by Cagle on the basis of her race. The

jury heard extensive testimony from Plaintiff and her daughter describing Cagle's alleged repeated comments, spitting, following, and threatening of Plaintiff on the basis of Plaintiff's race. (*See* Docs. # 208 at 63, 86, 158; 209 at 348-50). Therefore, there was sufficient evidence for the jury to conclude that Plaintiff had a good-faith, reasonable belief that she had been harassed by Cagle on the basis of her race.

Plaintiff next must have presented sufficient evidence to establish that she had opposed an unlawful employment practice. The evidence presented at trial indicates that prior to February 13, 2020, Plaintiff had threatened to report something to Dr. Chen (Doc. # 204-8 at 5), that on February 13, 2020 Plaintiff testified she intended to report "race harassment" to Dr. Chen (Doc. # 208 at 114), and that Dr. Grubbs asked Plaintiff not to escalate things to Dr. Chen before picking up the phone to call the police. (*Id.* at 116). Plaintiff also testified that Dr. Grubbs observed several alleged incidents in which Cagle made derogatory remarks about Plaintiff's name and nationality (*id.* at 63, 81), and that she called him multiple times to report incidents between her and Cagle outside of the lab. (*See, e.g.*, *id.* at 78-79; Doc. # 209 at 124-25). Together, this evidence is sufficient to allow a jury to conclude that it is more likely than not that Plaintiff opposed an unlawful employment practice of racial harassment by reporting the harassment to Dr. Grubbs and by telling Dr. Grubbs of her intention to report the harassment to others.

Regarding the second element, there was sufficient evidence for the jury to find that UAB took an adverse employment action against Plaintiff when she was arrested on February 13, 2020. UAB disputes that it took any adverse employment action, and argues that Officer Williams made an independent decision to arrest Plaintiff and that Dr. Grubbs's decision to call the police was constitutionally protected. (*See* Doc. # 214 at 3-9). The jury heard testimony that Dr. Grubbs called the police (Doc. # 208 at 119), told the police that he had been in a romantic relationship with

11

Plaintiff (this, according to Officer Williams) (Doc. # 209 at 75-76), and asked the police not to arrest Plaintiff. (*Id.* at 85). The jury also heard Dr. Grubbs's testimony that he did not tell the police that he had been Plaintiff's boyfriend because that was not true. (Doc. # 210 at 149). The question before the court is whether there is sufficient evidence for a jury to find that Dr. Grubbs's call and interaction with the police was an adverse employment action, or whether it was a but-for cause of another adverse employment action, such as Plaintiff's arrest.

An adverse employment action in a retaliation context is "an action that 'produces an injury or harm' and would dissuade a reasonable worker from engaging in protected conduct." *Hitt v. CSX Transportation, Inc.*, 672 F. Supp. 1192, 1201 (N.D. Ala. 2023) (quoting *Burlington N. v. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)). There was sufficient evidence from which a jury could have inferred that Dr. Grubbs lied to the police, as the jury heard testimony that Dr. Grubbs told Officer Williams that he was Plaintiff's ex-boyfriend, but later heard Dr. Grubbs testify that he never told the police this. While it is not always the case that merely calling the police and lying to them results in harm, if these actions proximately caused the adverse employment action of the ultimate arrest, then the jury could have found that these actions would have resulted in the harms of being physically restrained in jail, suffering the emotional and mental harm of having been arrested, and spending time and money on a legal defense.

UAB argues that Officer Williams's "independent decision [to arrest Plaintiff] severed any causal connection between Dr. Grubbs'[s] alleged retaliatory actions and Plaintiff's alleged harm." (Doc. # 214 at 4). The court disagrees.

UAB cites *Pennington v. City of Huntsville* for the proposition that "[w]here a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." 261 F.3d 1262, 1270 (11th Cir. 2001). But, at

least two points distinguish this case from that of *Pennington*. First, while *Pennington* involved a biased *subordinate* employee, Dr. Grubbs was not a subordinate employee to Officer Williams. Second, the final decisionmaker in *Pennington* recognized that an initial employment decision was potentially biased and therefore "personally conducted a fresh set of [] tests and interviews." *Id.* at 1269.

In this case, Officer Williams conducted a single investigation before arresting Plaintiff. If this single investigation involved information that was biased or incorrect, then that biased or incorrect information could have been a but-for cause of Plaintiff's arrest. The jury heard testimony that Dr. Grubbs told Officer Williams that he was Plaintiff's ex-boyfriend and that Plaintiff slapped him to prevent him from leaving. The jury also heard Dr. Grubbs deny telling Officer Williams that he was Plaintiff's ex-boyfriend and heard Plaintiff testify that she slapped Dr. Grubbs in response to him assaulting and groping her. Together, these two contradictions could have been sufficient evidence from which a jury could infer that Dr. Grubbs's phone call to and interaction with the police were misleading, and that they were but-for causes of Plaintiff's arrest.

The other two cases UAB cites involve an independent review by a group, which is also unlike this case where Officer Williams decided to arrest Plaintiff and no group of people conducted an independent review after the fact. *See Dixon v. Burke Cnty., Ga.*, 303 F.3d 1271, 1275 (11th Cir. 2002) (holding causal connection severed where a Grand Jury appointed someone to a board of education after the local District Attorney made a biased recommendation); *Mudahy-Nicholson v. City of Miami*, 2023 WL 6213627 (S.D. Fla., Aug. 17, 2023) (holding causal connection severed where a Civil Service Board conducted an independent review of an allegedly biased termination). Therefore, it is not clear that Officer Williams's decision to arrest Plaintiff

was sufficiently independent that it severed any causal connection between Dr. Grubbs's actions and Plaintiff's arrest.

UAB argues that this evidence is still insufficient to support a verdict against UAB because Dr. Grubbs's call to the police was constitutionally protected and therefore was not an adverse employment action. In doing so, UAB cites two cases that actually involve pursuing litigation – not calling the police. *See Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731 (1983); *BE&K Constr. Co. v. NLRB*, 536 U.S. 5126 (2002). While the pursuit of litigation could appear analogous to calling the police, it is distinguishable for at least two reasons. First, pursuing litigation involves the court system, which is a slower and more deliberative process than a police officer's decision to arrest someone based on probable cause. Second, the pursuit of civil litigation almost never results in confinement or jail time, while an arrest by the police often does.

It is also not clear to the court that there is any controlling or in-circuit authority that supports UAB's contention that Dr. Grubbs had a First Amendment right to call the police. UAB cites two out-of-circuit district court cases that describe filing a criminal complaint or pressing criminal charges as an exercise of First Amendment rights. *See Wiley v. Austin*, 2020 WL 5821269 (D. Nebraska, Sept. 30, 2020); *Howse v. Atkinson*, 2005 WL 1076527 (D. Kansas, May 4, 2005). Not only do these cases still lack an explicit holding that calling the police is protected First Amendment activity, but they are not controlling or even from districts within the Eleventh Circuit. Additionally, on a brief survey of Eleventh Circuit case law, the court has not uncovered any cases that support UAB's legal theory.

Nevertheless, even if UAB were correct that Dr. Grubbs had some constitutionally protected right to call the police, UAB concedes that any such right is limited if a call to the police "lacked a reasonable basis in fact or law, i.e. was objectively baseless." (Doc. # 214 at 8). On this

point, the jury heard sufficient evidence from which to conclude that Dr. Grubbs's phone call lacked a reasonable basis in fact or law. Plaintiff testified that she only slapped Dr. Grubbs in response to him being on top of her and groping her. (Doc. # 208 at 120-21). Dr. Grubbs testified to a different story – that Plaintiff had slapped him after he called the police and then attempted to prevent him from leaving. (Doc. # 210 at 141-42). Therefore, it was for the jury to decide who was more credible. It is not this court's role, in response to a motion for judgment as a matter of law, to weigh the credibility of the evidence at trial. The only question is whether there was sufficient evidence for the jury to conclude on this point, and there was.

Regarding the third element of a prima facie retaliation claim, the jury heard sufficient evidence from which to conclude that there was a causal relationship between Plaintiff's protected opposition conduct and Dr. Grubbs's phone call to the police, which Plaintiff argued to the jury precipitated her arrest. The jury heard evidence that prior to February 13, 2020, Plaintiff had threatened to report something to Dr. Chen (Doc. # 204-8 at 5), that on February 13, 2020 Plaintiff testified she intended to report "race harassment" to Dr. Chen (Doc. # 208 at 114), and that before picking up the phone to call the police, Dr. Grubbs asked Plaintiff not to escalate things to Dr. Chen. (*Id.* at 116). Plaintiff also testified that Dr. Grubbs observed several incidents in which Cagle made derogatory remarks about Plaintiff's name and nationality (Doc. # 208 at 63, 81), and that she called him multiple times to report incidents between her and Cagle outside of the lab. (*See, e.g.*, Docs. # 208 at 78-79; 209 at 124-25). Taken together, this is sufficient evidence for the jury to have concluded that Dr. Grubbs knew that Plaintiff intended to report Cagle's racial harassment to Dr. Chen, and that Dr. Grubbs called the police to prevent Plaintiff from doing so.

Regarding damages, Plaintiff was required to show that there was sufficient evidence that Plaintiff's arrest caused her emotional pain and mental anguish for which UAB is responsible. (*See*

15

Doc. # 196 at 2 (jury verdict form)). The jury heard testimony at trial that Plaintiff missed three days of work after she was arrested because she was in jail and later because she was still "upset" from the experience of being arrested. (Doc. # 209 at 22-23). The jury further heard evidence that two years later, in 2022, Plaintiff saw Dr. Thurstin and was diagnosed with chronic anxiety, avoidant behavior, and hypervigilance, which he agreed were symptoms of post-traumatic syndrome. (*Id.* at 97-99). Dr. Thurstin testified that Plaintiff had told him that she was distressed because of the arrest. (*Id.* at 307-08). Dr. Thurstin also testified that Plaintiff saw him again on August 30, 2024, and that she was still experiencing "hypervigilance." (*Id.* at 107). This testimony is sufficient to allow a jury to conclude that Plaintiff's arrest caused her emotional pain and mental anguish.

As to the question of whether UAB was responsible for Plaintiff's pain and anguish, employers are vicariously liable for the acts of their employees in the scope of their employment. *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) ("An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment")). Dr. Grubbs was an employee of UAB and Plaintiff's direct supervisor, so UAB may be held vicariously liable for Dr. Grubbs's actions in the scope of his employment. Dr. Grubbs called the police while at the office during normal work hours, and therefore there is evidence that his actions were in the scope of his employment. As already discussed, the jury also had sufficient evidence to conclude that Dr. Grubbs's call to and interaction with the police resulted in the adverse employment action of Plaintiff's arrest. Therefore, the jury could reasonably have concluded that UAB was responsible for whatever emotional pain and mental anguish Plaintiff suffered because of Dr. Grubbs's call to and interaction with the police.

Because the jury had sufficient evidence from which to reach its verdict, UAB is not entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### 2.    New Trial

After careful consideration, the court concludes that UAB is entitled to a new trial based on excessive compensatory damages, prejudice due to the combined trial of claims against UAB and Cagle, and Plaintiff's violations of the court's Order on Motions in Limine.

UAB argues that it is entitled to a new trial because the court's decision not to sever the trial of claims against Cagle and claims against UAB prejudiced UAB, and because the verdict was against the weight of the evidence. (Doc. # 214 at 10-16). In response, Plaintiff argues that trying the claims together did not prejudice UAB because the evidence of Cagle's harassment was relevant and admissible to prove the retaliation claim against UAB and because the verdict was well supported by the evidence. (Doc. # 219 at 21-27).

To determine whether UAB is entitled to a new trial, the court must assess whether the verdict is against the great weight of the evidence. *See Lamonica*, 711 F.3d at 1312-13. The court may also grant a new trial under Rule 59 if the "damages are excessive, or . . . the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis*, 817 F.3d at 1254 (quoting *Montgomery Ward & Co.*, 311 U.S. at 251).

A comparison between the compensatory damages the jury awarded against UAB with those awarded against Cagle strongly suggests that a new trial is warranted because of excessive damages and an unfair trial. As UAB highlights in its Motion (Doc. # 214), "the jury found Cagle liable for nine years of racial harassment, alleged to include frequent use of racial slurs, near constant spitting on Plaintiff, and threatening Plaintiff with a firearm," awarding $500,000 in

compensatory damages. (*Id.* at 10). Against UAB, whom the jury found liable for retaliating against Plaintiff by calling and interacting with the police, the jury awarded six times that amount – $3,000,000. The fact that the same jury awarded these verdicts at the conclusion of the same trial creates valid and substantial concerns that the jury ignored the court's instruction to not hold UAB liable for the alleged nine years of racial harassment by Cagle. To say that a phone call to and interaction with police, resulting in an arrest and a brief time in jail, resulted in six times the damage as did *nine years* of near constant and intense harassment, defies logic and the court does not hesitate to say that it appears to be against the great weight of the evidence.

Further, it is not lost on the court that the jury heard extensive testimony about Cagle's alleged nine years of racial harassment – evidence that was relevant to establishing Plaintiff's good faith basis for her opposition conduct, but that was likely much more detailed than it would have been in a trial focused solely on the retaliation claim against UAB. As UAB highlights (Doc. # 214 at 11), the jury could have inferred (UAB says incorrectly) from this extensive testimony, as well as from testimony about Plaintiff's complaints to human resources (*see* Doc. # 208 at 153), that UAB ignored Plaintiff's complaints of racial harassment. The jury could then have mistakenly concluded that UAB should be liable in some way for its inaction. And, this appears to be a plausible reason for the disproportionate compensatory damages award against UAB. For this reason alone, UAB is entitled to a new trial, severed from any trial involving Cagle.

However, there is yet another reason that UAB is entitled to a new trial. Plaintiff violated the court's clear Order on Motions in Limine (Doc. # 170), and did so more than once during the trial. After reviewing these violations, the court has substantial concerns that a jury who heard this inadmissible and prejudicial testimony would have been unfairly affected by it. Because of the

18

high likelihood that these violations would have biased the jury and prejudiced UAB, the court concludes that a new trial is warranted for UAB on this ground as well.

Before trial, the court entered an Order on Motions in Limine. (Doc. # 170). As relevant here, the Order set out that "Plaintiff's termination is not relevant to the remaining claims in this case. It does not make it any more probable or less probable that Cagle harassed Plaintiff or that Grubbs had a retaliatory intent when, prior to her termination, he called the police and she was arrested." (*Id.* at 7). In a footnote, the court indicated that "[i]f at trial, however, Plaintiff presents evidence that Cagle's alleged harassment caused her to suffer lost wages, the court may reconsider this ruling." (*Id.* at 8 n.1). The court's Order also made clear that evidence of Dr. Grubbs's "sexual orientation, his alleged sexual harassment of female employees, and his alleged sexual advances towards Plaintiff's ex-husband" was not to be mentioned at trial. (*Id.* at 9). Specifically, the Order emphasized:

> there are two claims left in this case: a retaliation claim against UAB relating to Plaintiff's arrest, and a harassment claim against Cagle. There is no issue of sexual harassment in this case. Plaintiff asserts that evidence regarding Grubbs' sexual orientation is relevant to the extent UAB and/or Cagle claim that Plaintiff and Grubbs were involved in some sort of romantic relationship. Such evidence will not be admitted because it involves speculation, it is prejudicial, and it is a waste of the jury's and the court's time.

(*Id.*). Despite these crystal clear directions in the court's Order, Plaintiff blatantly violated the Order – twice.

On the first occasion, when discussing the incident with the UAB police officer on February 13, 2020, Plaintiff responded to her counsel's question "What happened next?" with a description of what Plaintiff told the UAB police officer who was interviewing her that day. Plaintiff stated:

> then the UAB police officer . . . he came back and then he say, "You guys are in a relationship?" I say, "He helped me financially and he is my boss." He say, "No.

19

> Romantic." I say "No, sir," and then he say, "I ask him. He say I grope her because of the romantic relationship. I'm in a relationship with him – with her." I say, "No sir. <u>He's a homosexual man</u>."

(Doc. # 208 at 124) (emphasis added). This was in direct violation of the Order on the Motions in Limine (Doc. # 170) in which the court emphasized that "[s]uch evidence [of Grubbs's sexual orientation] will not be admitted because it involves speculation, it is prejudicial, and it is a waste of the jury's and the court's time." (*Id.* at 9). The court responded to this violation during trial with a limiting instruction and admonishment:

> All right. Ladies and gentlemen, I granted a pretrial motion saying that that testimony was irrelevant and would not be admitted, and counsel informed me that he had told the plaintiff that – of that pretrial ruling. I'm going to admonish you not to say that again.

(Doc. # 208 at 124).

There are several ways in which this testimony about Dr. Grubbs's sexual orientation could have been prejudicial against UAB. First, a jury could have been distracted by this irrelevant and potentially inflammatory information. Second, a jury could have speculated as to why UAB objected to admitting this testimony – perhaps by concluding that Dr. Grubbs was more likely to have retaliated against Plaintiff because she knew of his sexual orientation, which could have been information Dr. Grubbs wanted to keep private. Therefore, this violation of the Order in Limine could have led to the jury awarding excessive compensatory damages against UAB.

But there is more. Plaintiff violated the Order in Limine a second time, and on this occasion it was at the prompting of her counsel:

> Q. Okay. Are you still with UAB?
> A. No, sir.
> Q. Why not?
> A. I'm sorry?
> Q. Why not?
> A. I was terminated for –
> Mr. Kohler [UAB's counsel]: Objection. We went over this. We went over this.

(Doc. # 208 at 129). The court then held proceedings on the record outside of the presence of the

jury, telling Plaintiff's counsel:

> Counsel, what we discussed was that there would have to be some evidence that
> you put forth that would link the termination to the damages claimed against Cagle.
> It's not relevant to UAB, and in order for you to mention the termination – any
> termination in front of the jury, there would have to be some evidence that suggests
> that Cagle's behavior led to a loss of wages.

(*Id.* at 130). After hearing Plaintiff's counsel's argument for why UAB's termination of Plaintiff

could be relevant to the remaining claims in the case, the court concluded that "[i]t's not relevant

to any claim in the case. That's the issue." (*Id.* at 136).

The court then gave the following limiting instruction to the jury:

> Folks, the – any evidence about the plaintiff's termination at UAB isn't relevant
> until I tell you it is, and I've laid out for plaintiff's counsel the things that I believe
> you would have to establish before you in order for that to become relevant. They
> haven't done that yet. We're not sure they are going to do that. If they do, then I
> will green light them to present that evidence and let you hear it and then let you
> decide the factual issue, but at this point the termination of plaintiff by UAB is just
> not relevant to the claim against UAB and it's not relevant to the claim against
> Cagle, and therefore I'm going to ask you to disregard the last answer you heard
> the plaintiff give about the reason she left UAB, all right?

(*Id.* at 139-40). Despite this limiting instruction, the jury could have considered testimony that

UAB terminated Plaintiff as an additional retaliatory action by UAB. In this scenario, the jury

might have attempted to punish UAB for this action, even though a termination claim was not

being tried against UAB.

It is important to note that we are not dealing with an isolated violation of an Order in

Limine. Rather, Plaintiff twice blurted out to the jury evidence that, before the trial, the court had

ruled was inadmissible. And, both pieces of evidence were prejudicial and the second was invited

by counsel. When considering on appeal a motion for mistrial based on a party's or counsel's

misconduct, the district court is required to evaluate "the entire argument, the context of the

remarks, the objections raised, and the curative instruction" in determining whether the inappropriate remarks were "such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Ruiz v. Wing*, 991 F.3d 1130, 1141 (11th Cir. 2021) (quoting *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988)). Only the district judge is in the best position to undertake this analysis because it is the trial court that "had the opportunity to hear the offensive remarks within the context of the arguments and to view their effects on the jury." *Cote v. R.J. Reynolds Tobacco*, 909 F.3d 1094, 1103 (11th Cir. 2018) (quoting *James*, 845 F.2d at 318). Here, the court is convinced that these two violations of its Order on Motions in Limine likely had a prejudicial effect on the jury and its verdicts.

At the close of this case, the jury awarded $3,000,000 in damages against UAB for the isolated retaliatory action of calling and interacting with the police, which resulted in Plaintiff's arrest. Although Plaintiff presented evidence of mental and emotional damages resulting from this arrest (starting two years after the arrest), it strains logic that a single arrest that resulted in thirty hours of jail time would be worth $3,000,000 in damages, while nine years of harassment by Cagle would be worth one-sixth of that amount. This suggests that the jury either rendered a verdict against the clear weight of the evidence, was biased by hearing evidence of UAB's apparent inaction in response to Plaintiff's human resources complaints, or was prejudiced by hearing at least two pieces of testimony in violation of the court's Order on Motions in Limine, including that Plaintiff's employment with UAB had been terminated. Not only this, but these violations were punctuated by objections and limiting instructions, which had the potential of drawing the jury's attention even more to this prejudicial and inadmissible evidence.

UAB also argues that the verdict was against the weight of the evidence, but because the court concludes that a new trial is warranted on other grounds, evaluating those arguments is

unnecessary. As explained in the Order accompanying this Memorandum Opinion, because UAB was prejudiced by the claims against it and Cagle being tried together, any new trial shall be severed from the trial of Plaintiff's claims against Cagle.

### 3.    Remittitur

UAB argues the verdict should be reduced to $55,555 to reflect the relative length of the arrest when compared to Cagle's alleged nine-year period of harassment. (Doc. # 214 at 15-16). Plaintiff opposes UAB's motion by arguing that Plaintiff's psychologist and her own testimony established that her suffering lasted well beyond the short amount of time she spent in jail after her arrest. (Doc. # 219 at 26-27). At the outset, the court notes that UAB is clearly entitled to remittitur of compensatory damages due to Title VII's statutory cap on damages against an employer. Title VII caps compensatory damages to $300,000 for an employer that "has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year." *See* 42 U.S.C. § 1981a(b)(3)(D). In its answer to Plaintiff's Complaint (Doc. # 1), UAB admitted that "it had more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year." (Doc. # 12 ¶ 11). Therefore, UAB is entitled to a $300,000 cap on compensatory damages for intentional discrimination.

But UAB does not rest its argument for remittitur solely on this statutory cap. Rather, it argues that it is entitled to a remittitur to one-ninth of the compensatory damages awarded against Cagle – in other words, to $55,555. (Doc. # 214 at 15-16). UAB does not cite any case law as to this point, arguing that the proportional time period of nine years of alleged harassment by Cagle when compared to the single incident of Plaintiff's arrest counsels toward a conclusion that compensatory damages against UAB should be limited to one-ninth of the compensatory damages against Cagle. Because the court ultimately concludes that a new trial is merited for both UAB and

Cagle, it is unnecessary to evaluate the need to further remit the jury's award. UAB's motion for remittitur is due to be denied as moot.

B.    **Cagle's Motion**

1.    **Judgment as a Matter of Law**

Cagle argues she is entitled to judgment as a matter of law because as a coworker of Plaintiff she cannot be liable for a hostile work environment claim under 42 U.S.C. § 1981. (Doc. # 216 at 1-3). In response, Plaintiff argues that under this circuit's case law, Cagle's interference with Plaintiff's ability to perform her employment subjects her to liability under § 1981.

The court spoke to this issue in its summary judgment ruling, holding that because "the alleged discrimination at issue in Plaintiff's Section 1981 claim against Cagle was harassment, not a discriminatory employment decision in which Cagle did not participate . . . . Cagle may be liable under Section 1981." *Moeinpour v. Bd. of Trustees of Univ. of Ala.*, 2024 WL 2164626, at *16 (N.D. Ala. May 14, 2024).

Although in her Motion Cagle cites new cases holding that a non-supervisory coworker may not be held liable under § 1981, the court concludes that in-circuit precedent suggests that in the Eleventh Circuit, a non-supervisory employee *can* be liable under § 1981 if they are directly involved in the alleged discrimination. Among the cases Cagle cites are *Floyd v. Ne. Fla. Health Servs., Inc.*, which is an unpublished district court opinion within this circuit that notes that a plaintiff's "non-supervisory coworkers would be dismissed because a coworker cannot be held individually liable under § 1981 for . . . hostile work environment." 2015 WL 2412329, at *3 n.3 (M.D. Fla. May 20, 2015) (citing *Miller v. Wachovia Bank, N.A.* 541 F. Supp. 2d 858, 863 (N.D. Tex. 2008)). Additionally, *Miller v. Wachovia Bank, N.A.* is an out-of-circuit district court opinion that highlights "relevant principles" for non-employer liability in the Fifth Circuit, including that

where coworkers are "essentially the same" as the employer such that they exercise control over a challenged employment decision, they can be subject to liability. 541 F. Supp. 2d 858, 863 (N.D. Tex. 2008). *Miller* concludes that "recognizing a claim under § 1981 against a non-supervisor employee who has never exercised managerial authority over the plaintiff would not find clear support in current Fifth Circuit law." *Id.* at 863. In doing so, *Miller* outlines the development of Fifth Circuit law since *Faraca v. Clements*, 506 F.2d 956, 957 (5th Cir. 1975), which "recognized a right of recovery under § 1981 against individuals who are not privy to an actual or potential contract," pointing out that "[l]ater Fifth Circuit panels have narrowed *Faraca*'s holding." *Miller*, 541 F. Supp. 2d at 861-62 (citing *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997); *Felton v. Polles*, 315 F.3d 470, 480 (5th Cir. 2002); *Foley v. Univ. of Houston Sys.*, 355 F.3d 333 (5th Cir. 2003)).

However, in this circuit, Fifth Circuit case law before October 1, 1981 is controlling,[2] while case law after that date is merely persuasive. Each of the later panel decisions that *Miller* cites as narrowing *Faraca* were issued after October 1, 1981, and therefore are not controlling in this circuit. *Miller*, 541 F. Supp. 2d at 861-62 (citing *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997); *Felton v. Polles*, 315 F.3d 470, 480 (5th Cir. 2002); *Foley v. Univ. of Houston Sys.*, 355 F.3d 333 (5th Cir. 2003)). Upon a review of in-circuit case law below, the court concludes that the weight of decisions of district courts in this circuit favors a broader interpretation of individual liability under § 1981.

As the court discussed at summary judgment, persuasive in-circuit case law has consistently held that an individual can be liable under § 1981 if they were personally involved in

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the alleged discrimination. *See Moeinpour*, 2024 WL 2164626, at \*16 (citing *Johnson v. Family Practice & Injury Ctr., Inc.*, 437 F. Supp. 3d 1108, 1119 (M.D. Fla. 2020)); *see also Myers v. Jefferson Cnty. Comm'n*, 2022 WL 1913007, at \*5 (N.D. Ala. June 3, 2020) ("A plaintiff must also establish that an individual defendant was 'personally involved' in the employment decision"); *Perkins v. Kushla Water Dist.*, 2 F. Supp. 3d 1250, 1261 (S.D. Ala. 2014) (holding that to hold an individual liable for retaliation under § 1981 a plaintiff must make "an affirmative showing linking the individual defendant with the discriminatory action").

A plain read of the text of § 1981 supports this interpretation. Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). As the Supreme Court has held, § 1981 "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Under this reading, a coworker can impair a contractual employment relationship by personally creating a hostile work environment because doing so interferes with an employee's ability to perform their job and, in some situations, stay at their job.

For a coworker to be liable for a hostile work environment claim under § 1981, a plaintiff must establish that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on race or ethnicity; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily

abusive working environment; and (5) coworker is responsible for creating such an environment. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

As discussed at summary judgment, Plaintiff's ethnicity qualifies as a protected group for purposes of a § 1981 race discrimination claim. (Doc. # 108 at 23-25).

Further, the jury heard sufficient evidence that Plaintiff was subjected to unwelcome harassment based on her national origin that was sufficiently severe or pervasive to alter the terms and conditions of her employment. In brief, the jury heard testimony that Cagle called Plaintiff's name an "ass name" and mockingly asked if all the people from Plaintiff's country had the same name (Doc. # 208 at 63), called Plaintiff an "Iranian liar" and "sand n****r" (*id.*), said "Poop, ew" toward Plaintiff every morning (*id.* at 153), showed her middle finger to Plaintiff (*id.* at 155), followed Plaintiff closely in the lab such that Plaintiff could not do her work (*id.* at 157-58), implied she would shoot Plaintiff with a beebee gun so they could send Plaintiff's head "to her country" (*id.* at 158), and repeatedly engaged in similar name-calling and threatening behavior in non-work environments. (Doc. # 209 at 126-27, 127-31, 344-47). A jury could have concluded from this evidence that this alleged harassment did occur and that it was severe or pervasive. Further, as discussed above regarding non-supervisory liability under § 1981, a jury that believed Cagle acted in this way could have concluded that Cagle was directly liable for this harassment as she personally committed these actions. For these reasons, judgment as a matter of law is not merited for Cagle.

### 2.    New Trial

Cagle also argues she is entitled to a new trial because the verdict was against the manifest weight of the evidence and rested on uncorroborated and "unbelievable" testimony. (Doc. # 216 at 3-4). In response, Plaintiff argues that Cagle is not entitled to a new trial because a new trial

should not be granted on a court's credibility determination and there was sufficient evidence for a jury to find a racially hostile work environment. (Doc. # 220 at 12-13). Of course, Plaintiff is correct – it is not the court's role in a motion for a new trial to weigh the credibility of evidence. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 439 (11th Cir. 1996) ("The court may not weigh the evidence or decide the credibility of witnesses.") (citing *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988)).

However, for similar reasons as discussed relevant to UAB, the court concludes that at least one of the violations of the Order on Motions in Limine (Doc. # 170) prejudiced Cagle and merits a new trial for her as well. A district court may grant a new trial under Rule 59 if the "damages are excessive, or . . . the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis*, 817 F.3d at 1254 (quoting *Montgomery Ward & Co.*, 311 U.S. at 251). Because of the violations of the Order on Motions in Limine (Doc. # 170), the court concludes that Cagle's trial was not fair and raises questions of law due to substantial errors in admission of evidence to the jury.

Specifically, the court cannot say that Plaintiff's improper testimony that UAB terminated her did not prejudice Cagle because it left a suggestion that Cagle's alleged racial harassment resulted in Plaintiff being terminated. Finding Cagle liable for Plaintiff's termination could have opened Cagle up to greater liability (such as loss of employment), rather than merely finding Cagle liable for racial harassment. This was prejudicial testimony and could have resulted in an excessive damages awarded against Cagle. The testimony about Plaintiff's termination was also irrelevant, as the court emphasized to Plaintiff's counsel both before and during the trial. (*See* Doc. # 208 at 130). Because there was a substantial error in admitting this evidence in the presence of the jury, it raises questions of law about whether Cagle was unfairly prejudiced during the trial.

Additionally, the other errors of admission, such as Plaintiff's inadmissible testimony about Dr. Grubbs's sexual orientation, could have prejudiced Cagle by distracting and inflaming the jury, interfering with their ability to impartially weigh admissible evidence presented at trial. For these reasons, Cagle is entitled to a new trial.

### 3.      Remittitur

Cagle argues the verdict should be reduced because Plaintiff did not produce sufficient evidence of mental anguish damages, and the punitive damages award was unsupported by evidence and excessive when compared with the compensatory damages award. (Doc. # 216 at 4-8). Plaintiff responds to Cagle's motion by arguing that similar evidence supports the compensatory damages award and the punitive damages award was not constitutionally excessive because it was less than the compensatory damages award. (Doc. # 220 at 13-19).

Cagle's motion for remittitur is moot due to the grant of a new trial, and therefore it is unnecessary for the court to evaluate these arguments.

### B.      Plaintiff's Motion

Plaintiff moved for backpay along with prejudgment and post-judgment interest; front pay; total expungement of Plaintiff's arrest from UAB's files; reimbursement of the money Plaintiff spent for legal representation to defend her in the criminal proceeding; reimbursement of costs related to expungement of records related to her arrest and dismissal of her charges from the Birmingham City Police records; training for UAB supervisors related to retaliation in the workplace; and a letter of recommendation to assist Plaintiff in her job search. (Doc. # 217 at 1).

UAB has responded by opposing this motion and arguing that the court has already ruled that Plaintiff is not entitled to backpay or front pay, the monetary relief she is now requesting should have been presented to the jury and is limited by Title VII's statutory cap on compensatory

damages, and the remainder of the relief requested goes beyond the jury's findings and the evidence at trial.

Because the court grants UAB's motion for a new trial, Plaintiff's Motion for Equitable Relief against UAB is moot. However, to clarify the issues for the parties, the court briefly addresses the issue of backpay and front pay.

Plaintiff is not entitled to an award of backpay in this case, as the court has repeatedly held. (*See* Docs. # 108 at 21-23 (explaining that "[b]ackpay is not an available remedy for this claim"); 114 at 2-4 (reiterating this)). This is because Plaintiff's surviving claim against UAB is a retaliation claim that relates to Dr. Grubbs calling the police. To be eligible for backpay, a claim must involve an employment action that causes lost wages, such as an unlawful discharge, failure to hire, or demotion. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362 (1995) (describing backpay as measured from the "date of the unlawful discharge"). For these same reasons, Plaintiff is not entitled to front pay, because this is also a lost wages remedy that is not available for this particular retaliation claim. In an attempt to circumvent this holding, Plaintiff continues to argue that her arrest proximately caused her termination by pursuing an attenuated chain of causation from the alleged retaliatory action of calling the police (which Plaintiff did not argue or show caused her lost wages) to an employment action that could merit granting lost wages – Plaintiff's termination. (*See* Doc. # 217 at 3-4). During trial, Plaintiff improperly attempted to introduce evidence of Plaintiff's termination, arguing after its introduction[3] that it was relevant to the claims against Cagle. (*See* Doc. # 208 at 136). The court rejected this argument, noting that Plaintiff's termination was "not relevant to UAB" and ruling that Plaintiff had not established the causal links necessary to show that Plaintiff's termination was relevant to Cagle either. (*See id.* at 130, 136).

---

[3] As indicated above, the court was abundantly clear that before introducing any evidence of her termination before the jury, Plaintiff was required to lay a foundation that connected her arrest to her loss of employment.

Therefore, based on Plaintiff's pleadings as well as the evidence presented at trial, Plaintiff is not entitled to backpay or front pay against UAB or Cagle.

Because Plaintiff's Motion for Equitable Relief is due to be denied as moot, the court does not evaluate Plaintiff's other requested equitable relief.

## IV.    Conclusion

For the reasons outlined above, UAB's Renewed Motion for Judgment as a Matter of Law, New Trial or Remittitur (Doc. # 214) is due to be granted in part and denied in part. Cagle's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial, and Motion for Remittitur (Doc. # 215) is due to be granted in part and denied in part. Plaintiff's Motion for Equitable Relief against UAB (Doc. # 217) is due to be denied. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this January 15, 2025.

_____

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE